OPINION. Ofper, Judge: The first issue relates to a phase of petitioner’s depreciation accounting. The system employed by it is sometimes referred to as the retirement method. Both parties apparently recognize that by this means a taxpayer, particularly a railroad company such as petitioner, can reflect its loss from depreciation with adequate accuracy. The narrow question presented is whether when in 1934, the tax year before us, petitioner retired and wrote off certain components of its ways and structures which had been acquired prior to 1913, it should have reduced the ledger cost, maintained on its books apparently from the date of acquisition, to compensate for depreciation actually sustained prior to March 1,1913. Exhaustion and wear and tear is a physical fact. Its existence and extent are at least theoretically measurable. Various accounting practices designed to reflect its influence upon earnings and investment differ widely in detail. But no accounting system of itself creates exhaustion, or eliminates it. We are consequently unable to agree that, because the retirement system in use by petitioner assumes a constant level of repair and efficiency for the railroad property as a whole, it could undo the physical deterioration to which specific properties were subject. Respondent’s computation of the depreciation suffered prior to 1913 by the properties retired in 1934 was apparently based upon an arithmetical calculation on the assumption of straight line depreciation over the useful life of the property. This approach very possibly bears no true relation to the actual deterioration sustained before 1913 by petitioner’s property, and offers a less than satisfactory measure for application of the statutory language referring to “exhaustion, wear and tear * * * to the extent sustained.” But there is no dispute between the parties as to the depreciation of the specific assets in question nor as to its amount. Petitioner’s counsel stated at the hearing its intention “to concede that depreciation was sustained in the amount in question, $88,000.” The fact that the railroad as a single property may have maintained an undiminished value would not dispose of the existence of depreciation in particular instances. Cf. Central Railroad of New Jersey, 35 B. T. A. 501, 507. It does not follow, however, that any adjustment of petitioner’s ledger cost to reflect that item is required. The statute, it is true, calls for an adjustment of basis for depreciation “to the extent sustained.” But it also limits the command to what is “proper.”[1] Under the retirement system of depreciation accounting, expenses of maintenance, including restorations and renewals, even though under other systems they might require capitalization (see Bureau of Internal Revenue Bulletin F (1942), p. 7), are deducted as operating costs. These charges, coupled with the deduction of the cost of the item upon its retirement, are considered to be the rough equivalent of other methods of recovering cost through deductions for depreciation. Central Railroad of New Jersey, supra. It is thus evident that any specific physical property might be the vehicle for expenditures of restoration and renewal which in the case of a growing railroad could well equal or even exceed the depreciation occurring during the same period. The obvious purpose of the provisions of section 113 (b) in so far as they relate to March 1, 1913, adjustments, was to arrive at the amount of investment incorporated in the property on that date. See Ways and Means Committee Report, H. R. 1, 69th Cong., 1st sess., p. 5; 1939-1 C. B. (Part 2), p. 318; cf. United States v. Ludey, 274 U. S. 295. Thus, in addition to the requirement of depreciation adjustment, there is the further reference dealing with property “whenever acquired” to “expenditures, receipts, losses or other items properly chargeable to capital account.”[2] No fair approximation of petitioner’s investment in the properties in question or in any other properties retired or to be retired is feasible without the details of both expenditure and depreciation. But one of the purposes of the retirement system was to avoid the ascertainment and preservation of innumerable, comparatively small bookkeeping items. See Chicago & North Western Railway Co. v. Commissioner (C. C. A., 7th Cir.), 114 Fed. (2d) 882, 886, affirming 39 B. T. A. 661; certiorari denied, 312 U. S. 692. Eespondent recognizes that “the books frequently do not disclose in respect of the asset retired that any restoration, renewals, etc. have been made — much less the time or the cost of making them.” But unless the retirement system is capable of producing a figure which will fairly reflect the March 1,1913, investment as to both positive and negative figures, we can not regard it as proper to make an adjustment in one direction while recognizing the impossibility of others of a compensating character. It seems to us to follow that it would be inconsistent with the retirement system to call for an adjustment for pre-1913 depreciation and consequently that under the circumstances here present that adjustment is not “proper” and accordingly need not be made. The remaining question concerns deductions claimed by petitioner on account of the loss sustained by two of its subsidiaries which it made good. The details of the purpose and operation of the subsidiaries and of the arrangements among petitioner, its affiliates, and the subsidiaries are set forth in detail in our findings of fact and will not be repeated here. Normally corporations are separate juristic persons and are to be so treated for tax purposes. Burnet v. Commonwealth Improvement Co., 287 U. S. 415. There are exceptions, particularly where the subsidiary is so much a part of the parent in its operations that it amounts to no more than a mere department or agency. Southern Pacific Co. v. Lowe, 247 U. S. 330; North Jersey Title Insurance Co. v. Commissioner (C. C. A., 3d Cir.), 84 Fed. (2d) 898; Munson Steamship Lines v. Commissioner (C. C. A., 2d Cir.), 77 Fed. (2d) 849; cf. Higgins v. Smith, 308 U. S. 473. But usually there is a purpose in the creation of a separate legal entity and it is illogical and unrealistic to recognize the benefits flowing from separation of the corporate individuals and in the same breath to permit the parent to absorb the loss of the subsidiary for tax purposes as though the two were a single unit. Mississippi River & Bonne Terre Railway, 39 B. T. A. 995; cf. United States Fidelity & Guaranty Co., 40 B. T. A. 1010; Valuation Service Co., 41 B. T. A. 811. The first question in its present aspect is whether this situation is changed by the creation of a formal contract whereby the parent commits itself to defray the loss of its affiliate. It is clear, however, that the mere existence of a contract is not sufficient to convert such losses into ordinary and necessary business expense of the parent. The situation must be more closely examined to see whether in fact the expenses are business expenses and whether they are ordinary and necessary. Interstate Transit Lines v. Commissioner, 319 U. S. 590; U. S. Industrial Alcohol Co. v. Helvering (C. C. A., 2d Cir.), 137 Fed. (2d) 511, 518. For separate reasons it seems to us that the two deductions claimed here fail to qualify under these principles. The land company was organized to deal in real property and related items, such as water and electricity. It may be freely granted that some benefit accrued to petitioner’s business from these operations. But it by no means follows that the payment of the land company’s losses for 1934 was a necessity for the bestowal of these advantages. Petitioner concedes that the land company’s operations were conducted with a view to the securing of profits, and there is no demonstration that if a deficit was sustained in 1934 that was necessarily a permanent condition. Indeed, profits were apparently contemplated, since the same contract called for payment by the subsidiary to petitioner and its affiliates of the profits resulting in favorable years. The mere fact that petitioner undertook to bear this loss is hence no demonstration that either the contract itself or the payment under it was necessary, even though it might be persuasive if the parties had been dealing at arm’s length. See U. S. Industrial Alcohol Co. v. Helvering, supra. It does not in fact appear that in spite of the current operating deficit the land company’s financial condition was such that petitioner’s action was necessary in order to secure the continued operations of the subsidiary. Nor do any of the other attendant circumstances point to the necessity of the payment as a business expense. It was not until virtually the last day of the year that by the contract upon which petitioner relies it committed itself to undertake the designated reimbursement. Until then there had been no legally binding obligation upon it, although such benefits as it sought had already been secured. It was thus in a position to wait until the results of the year’s operations were known or could reasonably be estimated both as to itself and as to the subsidiary. Its action then had more of the aspect of a voluntary application to the two companies of what amounted to filing a consolidated return than to an unavoidable operating payment. The consolidated return was a privilege which in that very year was withdrawn from companies of the nature of petitioner and its affiliate; and of which the legislative purpose was precisely to eliminate permission for “the loss of one corporation to reduce the net income and tax of another.” See G. U. R. Co., 41 B. T. A. 223, 227; aff'd. (C. C. A. 7th Cir.), 117 Fed. (2d) 187. By such a practice as that instituted by petitioner, not only could the result of consolidated returns be obtained in the years when they would prove beneficial either to-the parent or the subsidiary,[3] but the requirement of consistency[4] would be eliminated, since a contract made in December of one year might have been canceled by mutual consent at the end of the next. At any rate, we do not regard such considerations as indicating the necessity for the contract. It is thus not so much on the ground that the action in question lacked a business purpose, see Gregory v. Helvering, 293 U. S. 465, as that the business necessity for the expenditure remains unproven on this record that we think the requirements of section 23 (a) are lacking. There is a different reason for denying the claim as to the losses of the parks company. Its purpose was to operate concessions in the national parks. It appears that when the concessions were granted the Department of the Interior[5] was unwilling to confer them upon a railroad company such as petitioner. This was recognized by petitioner as a reason for the organization of the parks company and the application by it for the concessions. It is true that the record remains obscure as to whether in the year before us petitioner, had it changed the method of operation, could have applied for and secured the concessions in its own name, but there is nothing to indicate an affirmative answer, and any failure of proof in this respect is a disadvantage from which it and not the respondent must suffer. Treating the operations of the parks company then, as we must, as transactions which would have been illegal if conducted by petitioner itself, everything announced on this subject in Interstate Transit Lines, supra, is equally applicable here. The loss in question can not be regarded as a part of the business of petitioner and hence must be disallowed as business expense. Reviewed by the Court. Decision will he entered wilder Rule 50. Revenue Act of 1934 : “SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. “(a) Basis fob Depreciation. — The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property.” “SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. • •*•*** “(b) Adjusted Basis. — The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided. “(1) General rule. — Proper adjustment in respect of the property shall in all cases be made— “(A) for expenditures, receipts, losses, or other items, properly chargeable to capital account, including taxes and other carrying charges on unimproved and unproductive real property, but no such adjustment shall be made for taxes or other carrying charges for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years; ******* “(C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent sustained ******* See footnote 1, supra. Since the subsidiary was committed to pay its profits to petitioner, there is no assurance that attempts to deduct these gains as a business expense of the subsidiary might not arise in years which were profitable for it but not profitable for the parent. See e. g., Regulations 75, art. 11 (a). Charged by law to “make and publish such rules and regulations as he [the Secretary of the Interior] may deem necessary or proper for the use and management of the parks * * *. He may also grant privileges, leases, and permits for the use of land for the accommodation of visitors in the various parks * * Public No. 235, 64th Cong., 1st sess., approved Aug. 25, 1916, 39 Stat. L. 535.