CHICAGO AND NORTH WESTERN RAILWAY COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37425. Filed February 27, 1958.

*Nelson Trottman, Esq., Harry B. Sutter, Esq., C. I. Waldo, Jr.,
Esq., Charles W. Davis, Esq.,* and *Frederic W. Hickman, Esq.,* for
the petitioner.

*Gerald W. Broooks, Esq., Harold H. Hart, Esq.,* and *Andrew
Kopperud, Jr., Esq.,* for the respondent.

OPINION.

ARUNDELL, *Judge:* Respondent determined deficiencies in income and surtaxes for the calendar years 1942 and 1943 in the amounts of $331,198.28 and $303,689.61, respectively. Petitioner claims there are no deficiencies and that it is entitled to a refund in each year. Respondent, on the other hand, has made claim for increased deficiencies under section 272 (e) of the Internal Revenue Code of 1939.[1] The years 1940 and 1941 are also involved in connection with a net operating loss carryover deduction from those years to the taxable year 1942.

The pleadings raised a large number of issues, all of which have been settled by the parties except two, namely: (1) Whether the respondent erred in including as interest income from a 93.66 per cent owned subsidiary, referred to herein as Omaha, an amount of $2,454,578 in each of the taxable years 1942 and 1943 and, in the alternative, if it should be finally determined that petitioner's net income for 1942 and 1943 should not be so increased, then whether interest deductions of petitioner and Omaha should be distributed, apportioned, or allocated under section 45 of the Internal Revenue Code of 1939 so that petitioner's net income for each of the years 1940 to 1943, inclusive, shall be increased by $2,146,335; and (2) whether the respondent erred in reducing the basis of items of roadway property retired in 1940, 1941, 1942, and 1943 by alleged depreciation sustained on such property prior to March 1, 1913, in the amounts of $280,123.65, $867,412.57, $651,813.88, and $297,761.90, respectively.

The evidence in this case was presented before a commissioner of this Court. The commissioner made a report of his findings of fact, which report has been served upon the parties. Both parties have filed some objections to those findings. The objections have been carefully considered. Most of the objections are not meritorious. The Court, therefore, adopts for the purpose of this opinion the findings of fact served upon the parties, with the exceptions and corrections noted in the next succeeding paragraph.

The last sentence in paragraph 42 of the findings is deleted. The amount of $693,728.39 appearing in the seventh line of paragraph 50 is corrected to read $693,782.39. The words "and freight" are inserted after the word "passenger" in line 2 of paragraph 62. The words "including materials and supplies" are inserted after the word "assets" in the first line of paragraph 68.

A brief statement of the principal facts relative to the interest issue is summarized below.

---

[1] All references to section numbers herein are of the Internal Revenue Code of 1939 unless otherwise designated.

Petitioner owned 93.66 per cent of the voting stock of Omaha from December 31, 1927, through the taxable years in question. Both petitioner and Omaha reported their income on an accrual basis of accounting. Both petitioner and Omaha, at all times here material, had the same president and other principal officers and a majority of common directors.

From 1921 to 1929, inclusive, the net income of Omaha, before deducting interest, averaged $3,069,463. Its total interest charges during the same 9-year period averaged $2,605,222. Omaha met all of these interest charges. During the first 5 months of 1930, obligations of Omaha amounting to $45,186,000 were to mature. At that time Omaha's credit would not permit a refinancing of these obligations without the guaranty of petitioner.

On November 1, 1929, petitioner issued $72,335,000 of its 20-year 4¾ per cent convertible gold bonds due November 1, 1949. Kuhn, Loeb and Company was paid an underwriting commission of $1,808,375 for its service in connection with the issue. Petitioner then loaned $45,186,000 of the proceeds of this issue to Omaha to enable the latter to discharge its maturing obligations of that amount and took in exchange Omaha's note dated June 1, 1930, due on or about January 1, 1940. The note was secured by a deposit of $45,186,000 of Omaha's 5 per cent bonds, dated March 1, 1930, and due March 1, 2000. These bonds were in turn secured by a first mortgage on the entire property of Omaha, dated May 1, 1929, and were later actually issued to petitioner on March 1, 1933, in exchange for the above-mentioned note of Omaha dated June 1, 1930. Petitioner charged Omaha with $1,250,566.15 of the above underwriting commission which was first placed in an open account. Later, in 1933, Omaha delivered to petitioner additional bonds totaling $1,000,000 in partial liquidation of the open account.

As of December 31, 1940, and through December 31, 1943, Omaha's indebtedness to petitioner remained constant at $46,186,000 in bonds and $2,905,559.71 in open account. Each drew interest at 5 per cent, which amounted annually to $2,309,300 on the bonds and $145,278 on the open account, or a total of $2,454,578. It is this interest which respondent contends petitioner should have accrued as income in each of the years 1942 and 1943.

During the 10-year period from 1930 to 1939, inclusive, the net income of Omaha, before deducting interest, averaged $525,406. Its total interest charges during the same 10-year period averaged $2,674,705.

On June 28, 1935, petitioner instituted proceedings for reorganization under section 77 of the Federal Bankruptcy Act. From that date until May 31, 1944, its property was in the custody of the United

States District Court for the Northern District of Illinois, Eastern Division. During that period the legal title to petitioner's property was vested in successive trustees appointed by the court. The reorganization was consummated on June 1, 1944.

During the years 1932, 1933, and 1934, petitioner [2] borrowed a total amount of $46,588,133 from the R. F. C. These loans were secured by pledge of various collateral, including the above-mentioned $45,186,000 of Omaha bonds which were delivered by petitioner to the R. F. C. on or about March 1, 1933. Prior to 1944 petitioner repaid $4,338,000 of the amount borrowed. In the summer of 1944 shortly after the consummation of the reorganization, petitioner's remaining obligations to the R. F. C. were liquidated by petitioner and the pledged $45,186,000 of Omaha bonds were returned to petitioner and have been held ever since in petitioner's treasury.

From the date of issue in 1929 until June 1, 1944, petitioner deducted on its Federal tax returns the full amount of interest accruing on its bond issue of $72,335,000. It did not pay the interest due thereon from January 1, 1939, to May 1, 1944, which unpaid interest amounted to a total of $14,316,302. In the reorganization the holders of such bonds received for them and for the unpaid interest due thereon petitioner's common stock in the amount of $45,860,390.

During the years 1929 to 1943, inclusive, Omaha took deductions on its Federal tax returns for interest accrued on its indebtedness to petitioner. The total amount of such interest deductions for those years was $34,786,925.25.[3] Of this amount, $22,511,995.73 accrued during the years 1929 to 1938, inclusive, and of the $22,511,995.73 accrued by Omaha, petitioner, because of the past profitable experience of Omaha and with the approval of the I. C. C., accrued in its income accounts and included in income reported in its Federal tax returns the amount of $11,212,886.09. These accruals were made in good faith in the belief that payment of such accrued amounts was reasonably assured. Petitioner did not accrue any interest income on the note and bonds after 1935, nor did it accrue any interest income on the open account after 1938. Petitioner did not pay any Federal tax on the interest so included as income in its Federal tax returns for the years 1931 to 1938, inclusive, because of deficits sustained by petitioner in each of those years. During the years 1929, 1930, 1931, 1933, 1935, 1936, and 1937, Omaha paid petitioner $4,296,676.87 of the

---

[2] The term "petitioner" as used herein is understood to include the respective successive trustees appointed by the court when reference is made to any period falling between June 28, 1935, and May 31, 1944, inclusive.

[3] In the findings there appear a few minor discrepancies in some of the figures which we have not attempted to reconcile for the reason that they agree with the stipulation of facts filed by the parties and, therefore, no further reference will be made to them in this Opinion.

interest that had accrued during those years. Omaha paid petitioner no interest during the years 1932, 1934, and 1938 through 1943.

During the years of World War II, the gross revenues of most railroads, including Omaha, were increased substantially. During those years Omaha's net income, before deducting interest, the amount of interest charges, and its net income (or deficit) after deducting interest, were as follows:

| Year | Net income before interest | Interest charges | | | | Net income (or deficit) |
|---|---|---|---|---|---|---|
| | | Due petitioner | | Due to others | Total interest charges | |
| | | On bonds | On open account | | | |
| 1940 | $466,849 | $2,309,300 | $146,298 | $58,128 | $2,513,726 | ($2,046,877) |
| 1941 | 1,775,139 | 2,309,300 | 145,278 | 26,240 | 2,480,818 | (705,679) |
| 1942 | 3,241,321 | 2,309,300 | 145,278 | 82,286 | 2,536,864 | 704,457 |
| 1943 | 3,979,112 | 2,309,300 | 145,278 | 71,264 | 2,525,842 | 1,453,270 |
| 1944 | 3,568,525 | 2,309,300 | 115,012 | 71,990 | 2,496,302 | 1,072,223 |
| 1945 | 3,269,103 | 2,309,300 | | 69,817 | 2,379,117 | 889,986 |
| Total | 16,300,049 | 13,855,800 | 697,144 | 379,725 | 14,932,669 | 1,367,380 |
| Average | 2,716,675 | 2,309,300 | 116,191 | 63,287 | 2,488,778 | 227,897 |

During the 7-year period following the war, namely, from 1946 to 1952, inclusive, the net income of Omaha, before deducting interest, averaged $1,172,408. Its total interest charges during the same 7-year period averaged $2,446,176.

In October 1935, the R. F. C. advised petitioner that it was in default on interest on its R. F. C. loan and that if Omaha had any earnings over and above operating expenses, such excess earnings should be paid to the R. F. C. in part payment of the coupons attached to the Omaha bonds deposited by petitioner with the R. F. C. as collateral for the purpose of meeting, pro rata, the deferred interest. In June 1937, petitioner agreed in writing with the R. F. C. that Omaha would not pay anything to petitioner on back interest or open account, except current matters, without notice to the R. F. C.

Notwithstanding its high wartime earnings during the taxable years in question, Omaha was insolvent in that its liabilities exceeded its assets. During these years the fair market value of the entire Omaha railroad system was approximately $30,000,000 while its liabilities to petitioner alone were as follows:

| | Dec. 31, 1942 | Dec. 31, 1943 |
|---|---|---|
| First mortgage bonds | $46,186,000.00 | $46,186,000.00 |
| Open account balance | 2,905,559.71 | 2,905,559.71 |
| Current interest | 2,454,578.00 | 2,454,578.00 |
| Past-due interest | 25,581,092.38 | 28,035,670.38 |
| Total | 77,127,230.09 | 79,581,808.09 |

Of the above amounts of past due interest owing petitioner by Omaha during the taxable years in question, a total of $6,916,209.22 (representing the difference between the previously mentioned $11,212,886.09 accrued by petitioner and the previously mentioned $4,296,676.87 paid by Omaha) represented interest which petitioner had accrued and reported as income in earlier years.

Omaha's net working capital (current assets less current liabilities) on December 31, 1942 and 1943, was as follows:

| | 1942 | 1943 |
|---|---|---|
| Cash | $5,343,490 | $12,787,567 |
| Materials and supplies | 1,810,285 | 1,627,791 |
| Other current assets | 1,410,531 | 1,592,370 |
| Total current assets | 8,564,306 | 16,007,728 |
| Less current liabilities (excluding any amount due petitioner for accrued interest) | 3,467,710 | 6,403,970 |
| Net working capital | 5,096,596 | 9,603,758 |

A reasonable amount of working capital for Omaha in 1942 and 1943 was approximately $2,000,000.

In the summer of 1942 after Omaha's earnings began to increase, Omaha's management gave consideration to the payment by Omaha of a part of the back amounts due petitioner. Counsel advised the management that petitioner's trustee could not demand and receive money from Omaha other than on current items without being in contravention of the earlier agreement with R. F. C.

When the reorganization was consummated June 1, 1944, the R. F. C. returned to petitioner the Omaha bonds which had been pledged to it. Thereafter, on or about October 17, 1944, Omaha paid petitioner a cash sum of $7,400,000. This was in liquidation of the entire principal balance in the open account on December 31, 1943, of $2,905,559.71 and past interest due in the amount of $4,494,440.29.

In 1945, Omaha paid petitioner as past due interest the total amount of $4,316,961.18.

The above payments in 1944 and 1945 of past due interest, in the total amount of $8,811,401.47, were $1,895,192.25 in excess of the $6,916,209.22 of interest which petitioner had accrued during the years 1929 to 1938, inclusive, but which remained uncollected on December 31, 1943 Petitioner applied the $1,895,192.25 to the oldest bond coupons outstanding, but since petitioner had never before accrued such coupons as income it reported the $1,895,192.25 as income in its 1945 Federal tax return.

Subsequent to 1945, all of the interest payments by Omaha to petitioner were applied to the oldest coupons outstanding and were credited to income by petitioner and reported as income on its Federal tax returns in each of the years in which payments were received.

These payments amounted to $2,000,000 in 1947, $2,000,000 in 1948, $1,200,000 in 1949, $2,500,000 in 1950, and $270,000 in 1953. The last payment of $270,000 in 1953 applied to bond interest due September 1, 1938.

In the opening entries on the books of the reorganized petitioner as of June 1, 1944, petitioner's investment of approximately $23,000,000 in the stock of Omaha was written down to $1.

In a statement attached to the deficiency notice, the respondent, in explaining his determination that petitioner's net income for each of the years 1942 and 1943 should be increased by $2,454,578 as representing interest accrued in those years on the bonds and open account of Omaha, said in part as follows:

> Your return was made on the accrual method of accounting and accordingly all income earned in the taxable year is includible in your return regardless of date of payment unless it is shown that the debtor is insolvent and that such income is uncollectible. This you have failed to do * * *

Petitioner has definitely shown that Omaha was insolvent during the years in question. As previously stated herein, Omaha owed petitioner on December 31, 1942, interest and principal in the total amount of over $77,000,000 when the fair market value of its entire railroad system was only approximately $30,000,000. Petitioner contends that it has also shown that there was no reasonable expectation that Omaha would ever pay the interest falling due in those years.

Respondent contends, nevertheless, that during 1942 Omaha had income available for interest of $3,241,321 and that petitioner should have accrued the $2,454,578 of interest due it from Omaha for that year. He makes the same contention for the year 1943 when Omaha had income available for interest of $3,979,112.

Petitioner answers these contentions with the argument that in the first place Omaha's earnings during the war years were abnormal and could not be expected to continue; that in any event any payment by Omaha to petitioner of interest should first be applied on the over $25,000,000 of back interest; and that it was wholly unreasonable to assume that Omaha could earn enough to pay off this back interest and the current interest falling due in 1942 and 1943 within a reasonable time thereafter, citing, among other cases, *Corn Exchange Bank* v. *United States*, (C. A. 2, 1930) 37 F. 2d 34, wherein the court said:

> The government should not tax under the claim of income, that which is not received during the taxable year and in all probability will not be paid *within a reasonable time thereafter*. When and if such income is received, it must be returned as such *for the year received*. [Emphasis supplied.]

Respondent does not contend that petitioner should have accrued any of the Omaha interest prior to 1942. In fact, he questions seriously whether petitioner should have accrued what it did accrue in the years 1929 to 1938, inclusive. We have found as a fact that the

latter interest was accrued in good faith at a time when petitioner had sufficient reason to believe that the interest so accrued would be paid within a reasonable time thereafter.

The respondent in his brief states that "[a] taxpayer committed to the accrual method of accounting must, in addition to having a fixed right to interest income, have a 'reasonable expectancy' of its receipt," citing *Corn Exchange Bank* v. *United States, supra.* The determination of whether petitioner in the instant case had a "reasonable expectancy" of receiving from Omaha the interest which became due in 1942 and 1943 is a question of fact. *Atlantic Coast Line Railroad Co.*, 31 B. T. A. 730, affirmed on other grounds 81 F. 2d 309. In that case we said, at page 749:

Decision of the issue in controversy here must rest upon the determination of a question of fact. If the facts indicate that there was a reasonable expectancy of receipt of the interest involved or that the petitioner would probably be able to collect such interest, then the full amount should have been accrued on its books and reported as taxable income * * *. On the other hand, if the facts show that there was a reasonable doubt as to the ability of the Steamship Co. to pay the interest, or if it was reasonably certain for any reason that the interest would never be received, petitioner was justified in reporting only such amounts as were actually paid by the Steamship Co. and received by it in each year.

In the instant case we think the facts indicate that there was no reasonable expectancy that petitioner would be paid the interest which became due in 1942 and 1943 within a reasonable time thereafter. Omaha was not only insolvent but it owed petitioner in 1942 and 1943 over $25,000,000 of past due interest.

Generally, the rules regarding how payments are to be applied where there are several debts are that the payment will be applied as the debtor directs; that if the debtor fails to make a timely application, the payment will be applied as the creditor directs; and that if neither makes a timely application, the court will apply the payment. 70 C. J. S. 255, sec. 50. See also *Lincoln Storage Warehouses*, 13 T. C. 33, affd. (C. A. 3, 1950), 189 F. 2d 337, and cases there cited; *Burton Swartz Land Corp.* v. *Commissioner*, (C. A. 5, 1952) 198 F. 2d 558; *Earl* v. *Napp*, 218 Wis. 433, 261 N. W. 400 (1935) ; and 6 Williston, Contracts sec. 1801.

In view of the above authorities and in view of the fact that both the debtor and creditor directed that payments made by the debtor be first applied to the earliest debts, we think that, in determining whether the current interest falling due in 1942 and 1943 would be paid within a reasonable time thereafter, we must take into consideration the large amount of past due debts owed by Omaha to petitioner, together with the facts that Omaha was hopelessly insolvent and that the sudden increase in Omaha's earnings was largely due to war conditions and probably would not continue with the ending of hostilities. Taking all of this into consideration, together with the entire record,

we hold that the respondent erred in determining that petitioner should have accrued as income, interest due from Omaha in the amount of $2,454,578 in each of the years 1942 and 1943. If we may test this holding by events subsequent to 1943, we see that the last payment made by Omaha to petitioner was in 1953 in the amount of $270,000 and was applied to bond interest due September 1, 1938, which is approximately 15 years before payment was received.

In a "motion to amend answer to amended petition, incorporating amendments" filed by respondent at the hearing and granted by the Tax Court commissioner hearing the case, respondent alleges, in the alternative, that if petitioner's net income for 1942 and 1943 is not increased by $2,454,578 in each year as representing interest accrued on the Omaha bonds and open account, then "respondent avers that interest deductions of petitioner and of Omaha should be distributed, apportioned or allocated under Section 45, Internal Revenue Code, so that petitioner's net income for each of the years 1940 to 1943, inclusive, shall be increased $2,146,335.00." This latter amount represents interest on $45,186,000 of petitioner's 4¾ per cent bonds, which was a part of the $72,335,000 of bonds issued by petitioner on November 1, 1929. It may be noted that under this alternative, respondent would adjust 4 years (1940–1943) instead of the 2 years (1942–1943) involved under the main issue. Section 45, prior to its amendment by section 128 (b) of the Revenue Act of 1943, is in the margin.[4]

Section 45 authorizes the respondent to apply the broad powers of that section only if he "determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income" of either Omaha or petitioner. Respondent has made no such determination. In *Seminole Rock & Sand Co.*, 19 T. C. 259, we expressed doubt whether the application of section 45 could properly be raised for the first time in the Commissioner's opening statement and again in his brief. See also *Palm Beach Aero Corporation*, 17 T. C. 1169, 1177; and *Commissioner* v. *Chelsea Products*, (C. A. 3, 1952) 197 F. 2d 620, 624, affirming 16 T. C. 840. In the instant case, the respondent has raised the question of the applicability of section 45, in the alternative, by an amended pleading.

We do not think that section 45 is applicable to the facts in this case. In reality, the respondent is not asking this Court to make any "distribution, apportionment, or allocation" of gross income or deductions, but instead he is now in reality asking this Court to *disallow*

---

[4] SEC. 45. ALLOCATION OF INCOME AND DEDUCTIONS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income or deductions between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

in each of the years 1940 to 1943, inclusive, $2,146,335 of the interest petitioner is entitled to deduct from its gross income under section 23 (b).[5] "Section 45 permits distribution, apportionment, or allocation of a deduction, but it nowhere permits disallowance thereof * * *." *General Industries Corporation*, 35 B. T. A. 615, 617. This case was cited with approval in *Hypotheek Land Co.* v. *Commissioner*, (C. A. 9, 1952) 200 F. 2d 390, 396, wherein the court said:

> In connection with section 45 of the Internal Revenue Code, it should be pointed out that whatever his view of the close association between petitioner and the Dutch banks, this clearly disclosed fact did not lead the Commissioner to make any attempt to "allocate, distribute or apportion" income between the corporations. He merely *disallowed* the deduction. Section 45 nowhere permits disallowance of a *deduction*, the action herein taken by him. General Industries Corp. v. Commissioner, 35 B. T. A. 615, 617. * * *

We see here no necessity to make any distribution, apportionment, or allocation of gross income or deductions in order to prevent any evasion of taxes or to clearly reflect the true income of the two organizations. In 1929, when petitioner issued $72,335,000 of its 4¾ per cent bonds and loaned Omaha $45,186,000 of the proceeds from its own bond issue, it had a reasonable expectancy of collecting from Omaha all of the interest on the note and bonds issued by Omaha to petitioner; and by reason of that fact petitioner, during the years 1930 to 1935, inclusive, accrued and reported as income, interest on such note and bonds in the total amount of $9,142,558.06, of which total amount Omaha paid petitioner $1,242,615 in each of the years 1930 and 1931 and $1,144,067.81 in 1933, or a total payment of $3,629,-297.81, leaving $5,513,260.25 of the $9,142,558.06 unpaid during all of the years 1936 to 1943, inclusive. In April 1933, the I. C. C. wrote petitioner a letter stating that the ability of Omaha to make payment of interest under conditions then existing was extremely doubtful and, therefore, such interest should not be included by petitioner as income, effective January 1, 1933. However, as a result of correspondence between petitioner and the I. C. C. the latter approved the accrual of approximately one-half of the interest due from Omaha for 1933 and 1934 and the first 4 months of 1935. No interest due from Omaha on the Omaha bonds has been accrued by petitioner since the first 4 months of 1935. Under the main part of this issue, we held that petitioner was not required to accrue and report as income the interest which became due during the taxable years 1942 and 1943 on the ground that in all probability Omaha would not be able to pay such interest within a reasonable time thereafter. We do not think that simply because of that holding we should, un-

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
* * * * * * *
(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness * * *

der section 45, disallow a part of the interest that petitioner is entitled to deduct on its own indebtedness. We are not holding that the interest due from Omaha is not income in any event. We are simply saying that under the law it does not have to be accrued and reported in 1942 and 1943. But, as was said in *Corn Exchange Bank* v. *United States, supra,* "When and if such income is received, it must be returned as such for the year received." And this the petitioner has done as it received past due interest in the years subsequent to the years in question. Suppose we were to hold that petitioner was not entitled to deduct interest on its indebtedness to the extent of $2,146,-335 for each of the years 1940 to 1943, inclusive, and in a later year Omaha would pay petitioner in full for all of the interest it owed petitioner, petitioner would be required to report such interest as income but would never have the benefit of a deduction for the interest it owed on its own indebtedness. This would give an artificial picture of petitioner's true income.

In *Hearst Corporation,* 14 T. C. 575, we said that "[a] distribution or apportionment implies, however, an allowance somewhere else of the disallowed deduction * * *." So if we were to disallow in each of the years 1940 to 1943, inclusive, $2,146,335 of the interest petitioner owed on its bond issue, Omaha would, on respondent's theory, be entitled to the benefit of such deduction, but it already was entitled to deduct interest on the bonds it issued to petitioner. Thus, there is no need for the application of section 45.

We hold, therefore, that section 45 is not applicable to the facts in this case.

Relative to the depreciation issue, we summarize below a brief statement of the stipulated facts.

During the years 1940, 1941, 1942, and 1943, petitioner retired from service many units of roadway property which had been acquired prior to March 1, 1913. Its accounting system for such properties was the retirement method. The retirement method of accounting is a recognized method of accounting and, prior to July 1, 1942, was generally employed in the railroad industry respecting roadway property, and still is employed for certain roadway property accounts. In the case of numerous items of roadway property retired in the years 1940 to 1943, inclusive, which were acquired prior to March 1, 1913, the cost of the separate items was unobtainable by petitioner from its books and records or, if obtainable at all, was obtainable only by the expenditure of much labor.

Under the terms of the Act of March 1, 1913, commonly referred to as the Physical Valuation of Property Act, the pertinent parts of which now appear as section 19 (a), chapter 1, title 49, of the United States Code, the I. C. C. was directed to "investigate, ascertain, and report the value of all property owned or used by

every common carrier" subject to regulation by the Commission. Subsection (b) of said section 19 provided that "in such investigation said Commission shall ascertain and report in detail as to each piece of property, other than land, owned or used by such common carrier for its purpose as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any."

Pursuant to the terms of the Physical Valuation of Property Act, the I. C. C. made a physical inventory and valuation of all of petitioner's property as of June 30, 1917, including all of petitioner's physical properties whether or not reflected in investment account on the books, and whether or not the cost thereof had been charged to capital accounts or to operating expenses. Upon completion of the inventory, the I. C. C. prepared an engineering report wherein the petitioner's properties as of June 30, 1917, were classified and set up by units. In this report two figures were shown for each unit, to wit, the estimated cost of reproduction new and the estimated cost of reproduction less depreciation thereof as of June 30, 1917.

The I. C. C. cost of reproduction new of the roadway properties retired by petitioner during the years 1940 to 1943, inclusive, which had been acquired prior to March 1, 1913, was as follows:

| | |
|---|---|
| 1940 | $1, 867, 490. 99 |
| 1941 | 5, 782, 748. 51 |
| 1942 | 4, 345, 425. 86 |
| 1943 | 1, 984, 782. 74 |

Paragraph 15 of the stipulation is as follows:

The parties agree that the Interstate Commerce Commission cost of reproduction new, as aforesaid, for all roadway properties involved acquired prior to March 1, 1913 and retired in the years 1940 to 1943, inclusive, shall be accepted, for purposes of this proceeding only, as the statutory cost or other basis duly adjusted for all matters required by section 113, Internal Revenue Code, except depreciation sustained prior to March 1, 1913 as provided in section 113 (b) (1) (C), Internal Revenue Code.

Paragraph 16 of the stipulation is, in part, as follows:

The parties agree that if as a matter of law applied to the facts of this case the cost of the specific properties retired in the years here involved is to be reduced for depreciation sustained prior to March 1, 1913, then the depreciation sustained prior to March 1, 1913 was 15% of such cost.

Our only question, therefore, is whether, as a matter of law, the above I. C. C. cost of reproduction new of the properties retired during the years 1940 to 1943, inclusive, which had been acquired prior to March 1, 1913, and which the parties agree shall be accepted as the statutory cost, is to be reduced by depreciation sustained prior

to March 1, 1913. The respondent contends that such reduction is mandatory under section 113.[6]

Before we consider this question, it may be noted that both parties arrived at the applicability or nonapplicability of section 113 (b) (1) (C) by slightly different routes. The respondent considers the case as if petitioner were seeking to deduct the amounts here in question under section 23 (f).[7] If that were true, section 23 (i)[8] would apply and the basis for determining the loss would be the adjusted basis provided in section 113 (b). Petitioner is actually seeking to deduct the amounts here in question under section 23 (1),[9] in which case the basis would be as provided in section 114 (a)[10] which is also the adjusted basis provided in section 113 (b). The reason petitioner is making its claim under section 23 (1) rather than under 23 (f) no doubt is due to the decision of the Court of Appeals for the First Circuit in *Boston & M. R. R.* v. *Commissioner*, (C. A. 1, 1953) 206 F. 2d 617, wherein the court, at pages 621 and 622, considered the applicability of both section 23 (f) and 23 (1) and concluded that section 23 (1) seemed "to be admirably adapted to the retirement system." In the instant case, we do not deem it material whether the deductions here claimed are made under section 23 (f) or 23 (1) since under either section the basis for the deductions is the adjusted basis under section 113 (b). See footnote 5 in *Boston & M. R. R.* v. *Commissioner*, supra at 624.

In determining the adjusted basis under section 113 (b), petitioner maintains that under the retirement method of accounting, it would be *improper* to reduce the stipulated "statutory cost" of the properties

[6] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.
(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property * * *

* * * * * * *

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.
(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—
(A) For expenditures, receipts, losses, or other items, properly chargeable to capital account * * *

* * * * * * *

(C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent sustained;
[7] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

* * * * * * *

(f) LOSSES BY CORPORATIONS.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.
[8] (i) BASIS FOR DETERMINING LOSS.—The basis for determining the amount of deduction for losses sustained, to be allowed under subsection (e) or (f), * * * shall be the adjusted basis provided in section 113 (b) for determining the loss from the sale or other disposition of property.
[9] (1) DEPRECIATION.—A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
[10] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.
(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property.

by depreciation sustained prior to March 1, 1913, under section 113 (b) (1) (C). The retirement method of accounting is a method which has long been recognized. *Central Railroad Co. of New Jersey*, 35 B. T. A. 501; *Chicago & N. W. R. Co.* v. *Commissioner*, (C. A. 7, 1940) 114 F. 2d 882, 887, affirming 39 B. T. A. 661, certiorari denied 312 U. S. 692; *Cincinnati Union Terminal Co.*, 44 B. T. A. 905; *Los Angeles & Salt Lake Railroad Co.*, 4 T. C. 634. In *Boston & Maine Railroad*, 16 T. C. 1517, 1526, we described the method as follows:

Under this method of accounting no depreciation account is maintained, but rather, the depreciation actually sustained is absorbed or accounted for by charging the capital items just described directly to expense or profit and loss and by crediting to the appropriate capital account at the time of retirement the original cost of the unit of property retired and the making of a corresponding charge to expense. The theory of this method of accounting is that although no depreciation is charged, as such, the capital accounts will as reasonably reflect the current investment in roadway properties at any given date as would be true if a specifically designated depreciation account were established and maintained by the "straight-line" or some other acceptable method * * *

See, also, *Akron, Canton & Youngstown Railroad Co*, 22 T. C. 648, 651.

In *Los Angeles & Salt Lake Railroad Co.*, *supra*, we held that a railroad, which was on the retirement method of accounting, and which in the taxable year had retired and written off the cost of assets acquired prior to 1913, was not required, under section 113 (b) (1) (C), to reduce such cost by depreciation sustained prior to March 1, 1913. In so holding, we said in part (at p. 648):

The statute, it is true, calls for an adjustment of basis for depreciation "to the extent sustained." But it also limits the command to what is "proper." Under the retirement system of depreciation accounting, expenses of maintenance, including restorations and renewals, even though under other systems they might require capitalization * * * are deducted as operating costs. These charges, coupled with the deduction of the cost of the item upon its retirement, are considered to be the rough equivalent of other methods of recovering cost through deductions for depreciation. *Central Railroad of New Jersey, supra.* * * *

To the same effect see *Union Pacific Railroad Co.*, 14 T. C. 401, reversed and remanded upon other grounds (C. A. 2, 1951) 188 F. 2d 950.

In *Boston & Maine Railroad, supra*, we said (at p. 1528):

As to the respondent's contention that section 113 (b) (1) (C), *supra*, is applicable regardless of the method of accounting used, we think it well settled that where the retirement method of accounting is properly and correctly established and maintained the original cost of items of roadway property installed prior to March 1, 1913, is not to be reduced by depreciation sustained to that date in computing and determining the amount of deduction to which a railroad is entitled upon the retirement of such property. The reason is that an accounting has already been made for the depreciation sustained through the

direct charge to expense or profit and loss of expenditures which under other methods of accounting would have been capitalized * * *. To hold in such circumstances that the original cost of the items currently being retired must also be reduced for depreciation sustained to March 1, 1913, would, in effect, be to require a railroad to make a double adjustment of the basis of its properties for depreciation.

In the *Boston & Maine* case, however, we felt that notwithstanding the well settled principles there enunciated, the burden was on the taxpayer to prove the original cost of the properties there being retired and, since the taxpayer had not done that, but was claiming the I. C. C. cost of reproduction new, we were unable to conclude and find on the record "that the deductions for the items retired if correctly determined by the retirement method of accounting would as a whole have exceeded the amounts allowed by respondent in his determination." (16 T. C. at p. 1531.)

The First Circuit, in *Boston & M. R. R.* v. *Commissioner, supra,* agreed entirely [11] with the legal principles stated in the course of our Opinion but did not agree with our ultimate holding. It held that the mere fact that the taxpayer was unable to prove the exact figures of original cost should not entitle the Commissioner, under the shelter of the rule as to the burden of proof, to use any and all means, no matter how obviously illogical and incorrect, to arrive at a substitute figure. Accordingly, the court held (206 F. 2d at p. 626)—

that the amount of the various deductions should be based on the ICC reproduction cost new figures which the government itself has proposed, but that these figures should not be diminished on account of sustained pre-1913 depreciation.

In the instant case, we have very much the same situation as we had in the *Boston & Maine* case, with one important exception, namely, a stipulation that the I. C. C. cost of reproduction new, for the purposes of this proceeding only, "shall be accepted" as the "statutory cost" duly adjusted for all matters required by section 113, except for depreciation sustained prior to March 1, 1913. See paragraph 15 of the stipulation previously quoted in full, *supra*.

Chief Judge Magruder, at page 625 of the court's opinion in the *Boston & Maine* case, also said:

[11] The court said (206 F. 2d at p. 625):
As concerns the holding that § 113 (b) (1) (C) has no applicability here, we are in entire agreement with the Tax Court, and shall not add much to what it has already said. In coming to this conclusion, the Tax Court relied on a recent decision in the Second Circuit, *Commissioner* v. *Union Pacific R. R. Co.,* 2 Cir., 1951, 188 F. 2d 950, where Judge Learned Hand, after carefully analyzing this question, concluded that to read the statute literally and apply it to a retirement system taxpayer would do severe violence to the principles of retirement accounting, and would result not in straight-line depreciation or retirement accounting, but some "unjust and illogical hybrid." 188 F. 2d at page 951. This is so because under retirement accounting no deductions are ever taken for sustained depreciation until an asset is actually retired, and in that year the entire unadjusted book value is charged off. * * *

The Commissioner in turn replies that he never determined the statutory "cost;" indeed that the ICC found that this figure could not be determined and that he merely used the ICC reproduction cost new figures as a "starting point" in his calculation.

In the case now before us, the parties have stipulated the "statutory cost." They agree that the I. C. C. reproduction cost new figures "shall be accepted * * * as the statutory cost." The purpose of this stipulation, as we understand it, was to remove the difficulty we had in the *Boston & Maine* case of not knowing the "statutory cost" of the retired properties so that we would have a clear-cut issue of law.[12] Although the language used in this stipulation appears to be perfectly clear, counsel for the respondent, both in his brief and at the hearing for oral argument, now takes the position that the words in paragraph 15 of the stipulation "duly adjusted for all matters required by section 113 * * * except depreciation" in effect takes the petitioner out of the retirement method. If that were so, we would have an entirely different question to decide than the one here posed. But this position would be inconsistent with paragraph 11 of the stipulation which stipulates that petitioner's accounting system for roadway properties "may be classified as the retirement method." Under such method, a railroad does not deduct depreciation as such, but in lieu thereof deducts as expense, items which under the depreciation method should be capitalized. *Boston & Maine Railroad, supra; Akron, Canton & Youngstown Railroad Co., supra.* Therefore, when the parties stipulate that the I. C. C. cost of reproduction new shall be accepted as the statutory cost "duly adjusted" for all matters required by section 113 (b) (1) (A), we think the words "duly adjusted" must be considered in the light of one whose accounting system is the retirement method and not the depreciation method. Cf. *Commissioner* v. *Union Pac. R. Co.*, (C. A. 2, 1951) 188 F. 2d 950.[13]

---

[12] It might be observed at this point that respondent does not agree in principle with what we and the Courts of Appeals have said to the effect that it is *well settled* that under the retirement method the statutory cost of property acquired prior to March 1, 1913, is not to be reduced by depreciation sustained to that date under section 113 (b) (1) (C) in computing the amount of the deduction to which a railroad is entitled upon the retirement of such property. In this connection, the following colloquy occurred between Trottman for petitioner and Brooks for respondent, at p. 1516 of the transcript:

Mr. Trottman: * * * I think the question presented here, the entire question presented is whether the Seventh Circuit will follow the First and Second Circuits; isn't that about the situation?

Mr. Brooks: I think it is about the situation, except we hope that we can have the Tax Court understand this troublesome theory and problem too.

[13] In the *Union Pacific* case, Chief Judge Learned Hand said (188 F. 2d at p. 953): At the hearing the parties were chiefly concerned with whether the case, as it stood, was within an earlier ruling of the Tax Court in Los Angeles & Salt Lake R. Co. v. Commissioner * * *. The Tax Court had there ruled that, unless the road had claimed, in addition to the original cost of the property, "expenditures" under § 113 (b) (1) (A), it was not subject to § 113 (b) (1) (C); and § 113 (b) (1) (A) did not apply in that case because the road had not claimed more than cost. In the case at bar the road was therefore anxious to prove that it did not rely upon § 113 (b) (1) (A), and the Commissioner was anxious to prove the opposite. As we have shown, it is immaterial, when the road

Both parties insist on the stipulation as it stands and each party believes the language to be unambiguous. They agree that the Court may and should exercise its judicial prerogatives regarding the stipulation, making such determination as it considers necessary to reach a decision.

We have given the most careful consideration to the arguments made by both parties, both orally and written, and to respondent's vigorous contention that our holdings in the *Los Angeles* and similar cases should be overruled, and have concluded ultimately that the plain meaning of the stipulation, taken as a whole, is that petitioner was operating under the retirement method of accounting as to the properties that were retired in the years 1940 through 1943 and that the "cost" of such properties, as that term is used in section 113 (a), is the "statutory cost" stipulated to by the parties.

We think the stipulated facts in this case are controlled by our decision in the *Los Angeles* case. In the *Boston & Maine* case, we again approved the legal principles enunciated in the *Los Angeles* case but held for the Commissioner because we did not know what the "statutory cost" of the properties being retired was, and could not, therefore, ascertain from the record whether the Commissioner had erred. Here, the parties have stipulated the "statutory cost" which, in our opinion, brings the case squarely within our ruling in the *Los Angeles* and similar cases.

We hold, therefore, that the respondent erred in reducing the "statutory cost" of the roadway properties here in question by alleged depreciation sustained on such property prior to March 1, 1913, in the amounts of $280,123.65, $867,412.57, $651,813.88, and $297,761.90 for the years 1940, 1941, 1942, and 1943, respectively. *Los Angeles & Salt Lake Railroad Co., supra; Union Pacific Railroad Co., supra; Akron, Canton & Youngstown Railroad Co., supra.*

*Decision will be entered under Rule 50.*

---

was keeping its books on "Retirement Accounting," whether anything was, or was not, added to cost under § 113 (b) (1) (A) ; because § 113 (b) (1) (C) does apply as little when "expenditures" have been added as when they have not. * * *