**YATES MOTOR COMPANY, INC.,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 76–1026.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1976.

Decided Aug. 30, 1977.

Dick L. Lansden, Waller, Lansden, Dortch & Davis, William E. Martin, Harwell, Barr, Martin & Sloan, Nashville, Tenn., for petitioner-appellant.

Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews, Elmer J. Kelsey, Philip I. Brennan, Gary R. Allen, Tax Div., U. S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before WEICK, PECK and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Taxpayer Yates Motor Company, Inc., appeals from a judgment of the United States Tax Court sustaining a determination by the Commissioner that Yates is not entitled to an ordinary loss deduction for its demolition of a building which it had formerly used for the sale and service of new Ford automobiles and trucks. The Commissioner had earlier ruled that taxpayer must instead amortize the $27,475.28 adjusted basis of the demolished building over the 15-year term of a lease of the land which Yates ultimately entered into with Shell Oil Company.

The building was built by Yates in 1951–2 to the specifications of Ford Motor Company and for use by Yates in its capacity as a franchised Ford dealer. In 1966, however, Yates was required by Ford to relocate the dealership.[1]

Pursuant to Ford's requirement, the taxpayer, in August, 1968, transferred the dealership to a new location which it had obtained and developed according to Ford's specifications, leaving vacant the building at the former place of business. On learning of Ford's new requirements, E. A. Yates, President and sole stockholder of the taxpayer, employed two real estate agents to assist him in disposing of the property or in finding an alternate use for it.

One Hooper, a realtor was engaged in April, 1967, to find a tenant for the property but advised Yates it would be "easier to rent if the showroom building was removed." Yates agreed. Taxpayer entered into an option to lease the property to Mobil Oil Company on August 27, 1968. By the terms of the proposed lease, either party could remove existing structures at its own expense. Hooper testified that Mobil had made it clear that the company would not exercise any rights under the option until the land was cleared, although clearance commenced as soon as Yates moved the

---

1. As the President and sole stockholder of the taxpayer testified at trial:

    I was subject to cancellation in 1966. Our relationship was good from 1950 until 1966, and due to their requirements, they wanted me to become a volume type dealer and my facilities at that time weren't adequate, so they told me that I was subject to cancellation or I'd have to sell—sell fifty percent of it, or sell it all, or get out and build a new building, get a new location, and that's—from 1966 to 1968 that's what my problem was with Ford.
    Tr. of Rec. at 11

dealership. Mobil permitted its option to expire on December 26, 1968.

Yates' second agent was his son-in-law, Estes. He advised Yates that the property would be easier to rent without the building and Yates again agreed. Estes tentatively negotiated with Shell Oil Company for lease of the premises while Mobil's option was still outstanding. On September 1, 1968, the Board of Yates Motor Company acknowledged that "there was no further need for the building owned by this corporation" and discussed a "lease to the Shell Oil Company for 15 years with five-year options at $19,800 per annum rent."

On March 27, 1969, Shell was given an option to lease the property; Paragraph 4 of the proposed lease required the taxpayer to "deliver to Shell possession of the premises, cleared of all structures, personal property and debris." Shell exercised its option in June, 1969.

Demolition was commenced in October, 1968 and was completed in April, 1969. According to Paragraph 14 of the stipulation of facts executed by counsel for the IRS and for petitioner, "[a]t the time of negotiations between petitioner and Shell Oil Company, March 27, 1969, the building had been substantially demolished except for the presence of debris."

■ The Tax Court, in ruling against the taxpayer, held that "[t]he resolution of this issue depends on whether the demolition of the building was contemplated by parties to the lease when they were negotiating its terms. If demolition of the structure was within the contemplation of the parties, then the adjusted basis of the demolished building may not be deducted as a loss under § 165(a) and the regulations adopted pursuant to that section," citing *Foltz v. United States*, 458 F.2d 600 (8th Cir. 1972); *Donald S. Levinson*, 59 T.C. 676 (1973); *Herman Landerman*, 54 T.C. 1042 (1970), aff'd, 454 F.2d 338 (7th Cir. 1971); *Laurene Walker Berger*, 7 T.C. 1339 (1946).

The court further held "Yates asserts that the prospect of leasing the property had no influence on his decision to demolish the building, and that he made the decision to do so independently and prior to entering negotiations with either Mobil or Shell. Viewing the record as a whole, however, we cannot agree."

It is the last court finding which we find to be clearly erroneous and which compels us to reverse. In other words, on an examination of the entire record we are "left with the definite and firm conviction that a mistake has been committed." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Although the taxpayer's position as summarized has been consistently maintained both in the Tax Court and on appeal, the parties have generally couched their dispute in terms of the differences among the circuits in interpreting Section 165 of the Internal Revenue Code, 26 U.S.C. § 165(a), (b) (1970), as interpreted by Income Tax Regulation § 1.165–3(b)(2). In short, taxpayer relies directly upon the provisions of § 165 of the Code:

(a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) Amount of deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

On the other hand, the Commissioner relies upon the interpretation which is contained in the Income Tax Regulation:

(b) *Intent to demolish formed subsequent to the time of acquisition.* (1) Except as provided in subparagraph (2) of this paragraph, the loss incurred in a trade or business or in a transaction entered into for profit and arising from a

demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. The amount of the loss shall be the adjusted basis of the buildings demolished increased by the net cost of demolition or decreased by the net proceeds from demolition. See paragraph (c) of § 1.165–1 relating to amount deductible under section 165. The basis of any building acquired in replacement of the old buildings shall not include any part of the basis of the property demolished.

(2) If a lessor or lessee of real property demolishes the buildings situated thereon pursuant to the requirements of a lease or the requirements of an agreement which resulted in a lease, no deduction shall be allowed to the lessor under section 165(a) on account of the demolition of the old buildings. However, the adjusted basis of the demolished buildings, increased by the net cost of demolition or decreased by the net proceeds from demolition, shall be considered as a part of the cost of the lease to be amortized over the term thereof.

The Ninth Circuit in *Feldman v. Wood*, 335 F.2d 264 (9th Cir. 1964), has taken the language in paragraph 2 of the Regulation, "pursuant to the requirements of a lease or the requirements of an agreement which resulted in a lease," to mean a formal clause in the lease for a particular party to demolish the building. This position was followed by the Fifth Circuit in *Hightower v. United States*, 463 F.2d 182 (5th Cir. 1972). The Seventh and Eighth Circuits, on the contrary, have adopted a more expansive reading of the Regulation and it is this construction which the Tax Court followed and which we are asked to adopt here. *Landerman v. Commissioner of Internal Revenue*, 454 F.2d 338 (7th Cir. 1971), held

that a permissive demolition clause in a lease, at the option of the lessee, would bar the deduction of the unamortized basis of the building in the year of demolition "where the parties to the lease intended to raze the existing structure at the time the lease was consummated." This construction of the Regulation was also followed by the Eighth Circuit in *Foltz v. United States*, 458 F.2d 600 (8th Cir. 1972), (Webster, District Judge, dissenting).

Our circuit has not thus far been confronted with this precise issue. Although we recognized the split in authorities in *Barry v. United States*, 501 F.2d 578, 584 n. 8 (6th Cir. 1974), we were not required there to choose between them.

As a backup position, the Commissioner urges that affirmance of the Tax Court is possible even without aligning ourselves with the Eighth and Seventh Circuits because the provisions of the Shell Oil Company lease expressly and unequivocally required the taxpayer to remove the building.[2]

In our view, however, the undisputed facts of this case fully support the taxpayer's contention that the decision to demolish the existing structure was independent of any requirement of a particular lease and was not, in fact, "pursuant to" such terms even though, after demolition had commenced, the Shell lease may have required that the job be finished.

What distinguishes this case from so many of the others is the undisputed fact that the building involved was built for a specific purpose and that its use for that purpose was abandoned by the owner by an economic event not of his making. It had become as worthless as if it had been destroyed by fire or other casualty loss. Its special purpose was stipulated by the parties and was so found by the Tax Court. Not one shred of evidence supports any

---

**2.** During the pendency of this appeal, the Treasury Department amended the Regulation in question to eliminate the deductibility of the loss where a lease agreement permits the lessee at its option to demolish a building. 41 Fed. Reg. 55,710 (Dec. 22, 1976), *amending* Treasury

Regulation § 1.165–3(b)(2) (1960). Since we are involved here with demolition by the lessor, we are not required to determine whether the amended Regulation would be retroactive if otherwise applicable.

finding of an alternate use for the building when Yates was obliged to abandon it and move to another location in order to retain the Ford franchise.

We have no quarrel with the Regulation relied upon or with the purposes behind it, but its application here, we conclude, would be a matter of the tail wagging the dog.

It is, of course, true that the burden rests upon the petitioner to establish the loss and the deductibility of it. *E. g., Kentucky Utilities Co. v. Glenn*, 394 F.2d 631, 637 (6th Cir. 1968). Upon any reasonable and realistic evaluation of the evidence here, that burden was fully met. This is not a case in which an owner of a building with remaining unamortized and useful life is persuaded to part with the value represented thereby in return for a more profitable development of it, a circumstance in which it can be said in all fairness that the taxpayer "has rather foregone his right to retain the property in its present state in return for acquiring valuable lease rights," such as a "right to *larger* rental payments" or "the substitution of a *more valuable* building by a lessee." *Landerman v. Commissioner of Internal Revenue, supra*, at 341. In addition to a $27,000 unamortized cost basis remaining on the building when it was demolished, according to the undisputed facts the taxpayer still owed approximately $75,000 on the mortgage. If the building, in fact, had any remaining value at all, it is certain he would not have commenced its total destruction without certain assurance at hand to compensate for the loss.

At the time demolition was commenced, Yates had at best the unfulfilled hope that Mobil would exercise its option or, failing that, the alternate hope that negotiations with Shell Oil Company would bear fruit. If we were inclined to apply the provisions of § 1.165–3(b)(2), the more logical application would be to link the demolition to the *Mobil* option, for most assuredly at the time Yates abandoned the building for his use as a Ford dealership, the pre-emptive option to lease was in Mobil and not Shell. Had Shell not entered into the lease, can there be any question but that the premises would have been demolished? Could the IRS have required Yates to spread the remaining cost over the term of a lease that never was executed? We think not.[3]

General considerations of policy underlying the tax law generally and the income tax regulation in particular simply do not support the construction given them by the Tax Court on these facts. On the other hand, we find much to support the position of the taxpayer here. The event triggering the loss was beyond its control and was by no means contrived. There is no evidence of any remaining value in the specialized structure when it was demolished. An artificial continuation of the amortization of costs of something which is no longer in existence bears no relation to the economic realities which were faced by the taxpayer. No intent to evade or avoid its tax liabilities by the manipulation of tax laws or regula-

**3.** The facts strongly suggest that the taxpayer could have alternatively claimed an equivalent depreciation deduction under § 167. *See generally* § 1.165–2; 5 J. Mertens, Jr., The Law of Federal Income Taxation § 28.18 at 56 (rev. ed. 1975). Yates retired the building from use on its trade or business when it transferred the dealership, vacating its old location. § 1.167(a)–8(a). The building was physically abandoned, and "the intent of the taxpayer . . . irrevocably to discard the asset," required by § 1.167(a)–8(a)(4), is established by the fact of demolition, which closely followed the taxpayer's abandonment. *Tanforan Co. v. United States*, 313 F.Supp. 796, 802–04 (N.D. Cal.1970), *aff'd*, 462 F.2d 605 (9th Cir. 1972); *see* § 1.167(a)–9. Having met the conditions set forth in the Regulations under § 167, the taxpayer would be entitled to recognize a deduction equal to the adjusted basis of the building. § 1.167(a)–8(a)(4).

In permitting deductions for depreciation, Congress intended to spread the costs of an asset over those tax years in which the asset contributes to the production of income. *Massey Motors, Inc. v. United States*, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). Here, the building's usefulness to the taxpayer's business ended with its abandonment and demolition. The taxpayer should consequently be allowed to depreciate its remaining basis in the year the asset was retired from service, rather than in future years which bear no relationship to the production of income.

tions is evident. The loss occurred. The defendant should be allowed to take it.

Reversed and remanded for entry of judgment in favor of the petitioner.