IVAN GROSSMAN AND SHERRY GROSSMAN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4918–78.    Filed September 4, 1980.

*Herbert M. Gannet* and *Kenneth S. Apfel,* for the petitioners.
*William F. Halley,* for the respondent.

STERRETT, *Judge:* By letter dated April 6, 1978, respondent
determined a deficiency in income taxes due from petitioners for
their taxable year ended December 31, 1974, in the amount of
$20,625. The issues for decision herein are: (1) Whether there
was a second inspection of petitioners' books and records within
the meaning of section 7605(b), I.R.C. 1954, and (2) the character,
as currently deductible or capital, of certain claimed demolition
expenses. A third issue, with respect to the amount of income
petitioners must recognize with respect to an installment sale of
property in New York City, was conceded by petitioners subject
to the outcome of the section 7605(b) issue.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The
stipulation of facts and exhibits attached thereto are incorporat-
ed herein by this reference.

Petitioners Ivan and Sherry Grossman, husband and wife,
resided in Los Altos Hills, Calif., in 1974 and at the time the

petition herein was filed. Petitioners filed a timely cash-basis income tax return for their taxable year ended December 31, 1974, with the Internal Revenue Service. As Mrs. Grossman is a party hereto solely by virtue of having filed jointly with her husband, petitioner, as used herein, shall refer only to Mr. Grossman.

Throughout 1974, petitioner and his brother, Solomon Grossman, each owned an undivided 50 percent of the real property located at the intersection of Gregory Avenue and River Drive in Passaic, N.J. (the Gregory Avenue property), and each was entitled to recover 50 percent of any net gain and claim 50 percent of any net losses therefrom. Petitioner and his brother purchased the major portion of this parcel in 1960. Hereafter petitioner and Solomon Grossman will be collectively referred to as the "Grossmans."

The Grossmans have been in the dry cleaning business for many years, and in 1960 they decided to open up a dry cleaning plant in Passaic. They acquired the Gregory Avenue site for that purpose, demolished the old building thereon and built a new Topps Cleaners facility.

This facility operated successfully until 1970. In that year construction of Route 21 neared that part of Passaic where the Topps Cleaners building was located. In conjunction with this construction, the roads leading to and from Route 21 in the vicinity of the Gregory Avenue site were redesigned and reconstructed, thereby effectively excluding traffic from the area of Gregory Avenue where the Grossmans' cleaners was located. Further, in redesigning the local roads, Passaic took part of the Topps Cleaners parcel. Thus, while the original Topps lot consisted of lot 33[1] (building) and lot 30 (parking), the city took part of lot 30. To replace this lost parking capacity, the Grossmans purchased other contiguous parcels of land, and in 1970, they purchased lots 21 and 26 for parking, and, in 1971, lot 35 which had several older structures on it. Occupying one of the buildings on lot 35 was a sweater manufacturer. Unfortunately, these attempted curative acquisitions were of no avail; the business did not recover and failed in 1970.

---

[1]Lot numbers refer to lots on the tax assessment map of the city of Passaic.

After the business failed, and starting in 1970, the Grossmans, through Solomon Grossman,[2] sought to lease out the Topps Cleaners parcel. Throughout 1970, 1971, 1972, and 1973, they were unable to rent the parcel even though many inquiries were received. Part of the difficulty in renting the building was that in 1969 or 1970, the city of Passaic had rezoned the area in which the Gregory Avenue property was located from commercial to manufacturing. While Topps Cleaners, a commercial use, qualified for continued operation as a nonconforming use under a grandfather clause in the rezoning law, such an accommodation did not extend to any new user of the property. Yet many of the inquiries the Grossmans received with respect to the Gregory Avenue property were from persons wishing to use the parcel for fast food restaurant purposes, i.e., purposes which would require a zoning variance from the city of Passaic. Inquiries were received, for example, from McDonald's Corp., Wetson's Corp., Ginos, Rustler's Restaurants, and Burger King. In addition, inquiries were had from Firestone Tire & Rubber Co.; Dunrite Auto Service Centers, Inc.; the National Newark & Essex Bank; and Econo-Fix (a do-it-yourself auto repair operation). Most, or all, of these prospective uses, however, also required zoning variances. Accordingly, the Grossmans, perceiving the increased profitability available from the Gregory Avenue property were it rezoned commercial, began in 1970 what was to be a 4-year battle to obtain a zoning variance.

Throughout the years 1970 through 1974, while the Grossmans were unsuccessfully attempting to rent the parcel and obtain a zoning variance for the property, the buildings located on the property were deteriorating. Lack of maintenance was magnified by acts of hooliganism. Vandals began to victimize the buildings; windows were broken and fires were set. As the buildings deteriorated, several city departments began to note violations of various city code provisions. For example, on November 23, 1971, Solomon Grossman was advised of violations of the fire prevention code and given notice to have the same corrected immediately. On February 23, 1972, the Department of Public Safety, Bureau of Combustibles and Fire Risks, advised the Grossmans of violations requiring correction. On May 3,

---

[2] Because petitioner lived on the West Coast, Solomon acted on behalf of both himself and his brother in all matters pertaining to the transactions in issue.

1972, the Department of Inspections directed the correction of certain violations and threatened the filing of a complaint in municipal court. On August 16, 1972, notice was received from the Division of Health of the city of Passaic that violations were present on the premises and that such violations had to be corrected within 12 days. On September 14, 1973, further problems were brought to the attention of the Grossmans by the Division of Health with respect to sanitation and unauthorized use of the premises. Because of these violations, insurance on the buildings became more difficult to maintain.

During most of these years, only one portion of the property was occupied. One small section of one of the buildings in the back of the property was leased by a sweater manufacturing firm. This firm was a recalcitrant tenant which the Grossmans had tried repeatedly to evict. Its presence on the property not only increased the losses they were suffering on the property by, for example, requiring heat, but also because the tenant was a continual source of danger. For instance, the tenant maintained the premises in such an unkempt fashion as to make the possibility of fire more likely than would otherwise be the case. Further, the manufacturer was only an occasional one. It was not always in operation, but when it was in production, its rented area was crammed with people, thus creating a further hazard should fire occur. The presence of this tenant, then, on the property added to the Grossmans' fears of continued losses and perhaps even law suits stemming from their ownership of the buildings. The hazards posed by the sweater manufacturing tenant were magnified as the condition of the abandoned buildings on the Gregory Avenue property deteriorated.

Throughout these years, negotiations continued between the Grossmans and prospective lessees and purchasers with respect to the Gregory Avenue property. In April of 1974, Robert T. Morrow (Morrow), representing Morrow Restaurants Corp., became interested in the property for a Burger King restaurant. While negotiations ensued with respect to the property, Morrow cooperated with the Grossmans in attempting to obtain the sought-after zoning variance. For example, Morrow provided the Grossmans with a Burger King restaurant plan to submit to the appropriate city agency.

The negotiations between Morrow and the Grossmans led to a meeting on July 2, 1974, attended by Morrow, Solomon Gross-

man, their attorneys, and others. Solomon Grossman had anticipated that a lease agreement would be signed at this meeting. Instead, negotiations totally collapsed because of the parties' failure to agree on two basic points: (1) The amount which the Grossmans would contribute toward construction of the restaurant, and (2) Morrow's refusal to guarantee personally the payments due from the restaurant, which would be contained in a separate corporation, under the lease. While the Grossmans finally agreed to contribute approximately $160,000 towards construction of the restaurant, Morrow wanted approximately $200,000. Among the provisions of the lease discussed between the parties at the July 2 meeting are the following (of course the $160,000 portion was not agreed to):

*Erection of Building.* As the requisite permits are obtained by Lessee or its agent, Lessor agrees, at his own cost and expense (not to exceed One Hundred Sixty Thousand ($160,000) Dollars expenses, as hereinafter provided at paragraph 31), to permit Lessee's designee to erect or cause to be erected upon the premises a restaurant in accordance with the plans and specifications furnished to it by the Lessee, which plans and specifications have been reviewed by Lessor and are attached hereto and made a part hereof, and refer to a building commonly known as a "Burger King" (Plan # BK 22 with ½ basement) restaurant, and said building shall be erected in accordance to the site plans furnished by the Lessee to Lessor and approved by the Zoning Authority of the City of Passaic. Lessee agrees to procure all building permits at its own cost and expense.

*Building Costs.* It is understood and agreed that the Lessor will pay an amount up to the sum of One Hundred and Sixty Thousand ($160,000) Dollars in the construction of the building referred to in said lease. Construction costs shall include demolition of present buildings on site, preparation of site, paving, sidewalks and all costs required under Paragraphs 6 and 7 of said lease. The expense of any costs in excess of the said amount of One Hundred Sixty Thousand ($160,000) Dollars shall be borne by the Lessee and shall be paid at the commencement date of said lease.

After negotiations between Morrow and the Grossmans collapsed on July 2, 1974, no meaningful discussions took place between the two sides with respect to the Gregory Avenue property until early January 1975. In the meantime, the Grossmans continued their efforts to sell or lease the property. They also continued their attempts to obtain a variance from the city. For this purpose, the Grossmans continued to use Burger King as a prospective lessee on the various applications submitted to the city because of their belief that, once they obtained a variance for a fast food restaurant on the Gregory Avenue

property, it would be a relatively easy matter to substitute another lessee, if necessary, for the Burger King contained in the applications. The actual variance applications were submitted in August of 1974.

Also after the negotiations with Morrow collapsed and in the latter part of July, the Grossmans determined to demolish the buildings located on the Gregory Avenue property. In making this decision, they were animated by their increasing concern over possible civil, or even criminal, liability they might face should the building catch fire, collapse, or should some injury occur on the property. Also, they were cognizant, as mentioned, of the possible increased profitability from the building should they obtain a variance and be able to "build to suit." The possible profitability of the site was contrasted with the mounting losses they were suffering because of the continued existence of the deteriorating buildings on the site.

Thereafter, and apparently with the help of Morrow, the Grossmans obtained demolition bids and proceeded to attempt again to evict the sweater manufacturer. On November 4, 1974, the Passaic Board of Adjusters passed a resolution that the Grossmans' application for a variance be granted. Sometime after November 14, 1974, the Grossmans accepted a bid from a demolition contractor. Full approval of the variance was granted on November 21, 1974. On December 16, 1974, within days of the final eviction of the sweater manufacturer, demolition was commenced. Demolition was completed on December 26, 1974.

In January of 1975 Morrow, having returned from a vacation, discovered that the Gregory Avenue site had been leveled. He called Solomon Grossman to determine whether it would be possible to enter into an agreement. At that time, the Grossmans agreed to contribute $200,000 to construction of the restaurant. In return, Morrow was now willing to agree to guarantee, personally, the lease. Thus, on January 14, 1975, the Grossmans entered into a written lease agreement with Morrow Restaurants Corp. whereby Morrow Restaurants Corp. leased the Gregory Avenue property for a Burger King restaurant. The lease entered into in January of 1975 was substantially the same as the proposed lease discussed in July of 1974. However, in an addendum to the January 1975 lease, the parties agreed as follows:

The Lessor agrees that Lessor shall:

(i) Be responsible for and pay the first $200,000 of the total costs for all of the aforesaid building, improvements and site work; including $11,350 heretofore paid by Lessor for demolition and engineering.

(ii) Execute a contract with Rono Construction Corporation (which has been initialed by Lessee) for the construction of the said building, as set forth in said contract.

The Lessee agrees that Lessee shall:

(i) Be responsible for and pay any amounts in excess of $200,000 for the total costs of the said building, improvements, site improvements to the land.

(ii) Install all necessary equipment required to operate a Burger King Restaurant at Lessee cost and expense * * *

In addition a guarantee agreement was attached to the lease.

As a result of their demolition of the buildings on the Gregory Avenue site, the Grossmans claimed a deduction totaling $74,384.53 or $37,192 per brother. The total claimed deduction consisted of $64,184.53 allocable to the adjusted basis of the buildings demolished and $10,200 for the actual cost for demolition.

Petitioner's 1974 income tax return was examined prior to June 15, 1976, by the Office of the District Director in San Francisco, Calif. On June 15, 1976, a "no change letter" was sent to petitioner. Also, in 1976, Solomon Grossman's 1974 individual income tax return was audited by the Offices of the District Director in Newark, N.J. This audit resulted in proposed adjustments with respect to his 1974 return, including the disallowance of his share of demolition loss on the Gregory Avenue property and a recomputation of the installment gain recognizable in 1974 on the sale of certain property in New York City. Both of these proposed adjustments were with respect to properties in which Solomon and petitioner each owned a 50-percent interest.

An information report was prepared by the Newark District Director and forwarded to the District Director in San Francisco. Such report was received by the San Francisco District Director on November 21, 1977. In response to the above information, a revenue agent sent a letter to petitioner on December 20, 1977, soliciting a general Form 872 consent to extend the statute of limitations with respect to the 1974 taxable year. On December 28, 1977, petitioner's attorney forwarded a restricted Form 872 for the year 1974 to the Internal Revenue Service at San Francisco. This form was not accepted by the District Director in San Francisco. Instead, a new restricted

consent form was prepared by the District Director and forwarded to petitioner for signature. Petitioner executed and returned this new Form 872 to the District Director on February 6, 1977. The District Director, however, upon reconsideration, refused to sign the new Form 872 and the statutory notice of deficiency was issued on April 6, 1978, with respect to petitioner's 1974 taxable year return.

There was no reinspection of petitioner's books and records from the date of the no change letter to the date of trial. The only adjustments contained in the notice of deficiency were those which involved property in which Solomon and petitioner were each one-half owners and which stemmed from the audit of Solomon Grossman's 1974 return. No reopening procedures were undertaken by respondent.

## OPINION

Initially, we must treat petitioner's claim that the instant notice of deficiency is "invalid because it is based upon information acquired from a second inspection of petitioner's records after the audit of the year 1974 was closed and no written notice of the second inspection was given as required by section 7605(b)." Prior to June 15, 1976, petitioner's 1974 tax return was examined by the Office of the District Director of San Francisco, Calif. This return reported petitioner's share of the claimed $74,384.53 demolition loss and petitioner's share of that year's gain under an installment sales contract for real estate. All the records relating to these transactions were available to respondent during the examination. A "no-change letter" was issued on June 15, 1976. Also in 1976, however, the District Director in Newark, N.J., examined Solomon Grossman's 1974 income tax return. This resulted in proposed adjustments to Solomon Grossman's return and an information report being forwarded to San Francisco. From June 15, 1976, to the trial date, no second inspection of petitioner's books of account was undertaken. Rather, the deficiency notice to petitioner was based upon respondent's inspection of Solomon Grossman's books of account and petitioner's income tax return.

Petitioner argues that he and his brother Solomon had identical records with respect to their jointly owned property. He goes on to argue that, as the same records respondent inspected in auditing Solomon Grossman's return in New Jersey

were available to those persons auditing his return in California, the inspection of Solomon Grossman's books of account was a second inspection as to him. Further, citing Rev. Proc. 72–40, 1972–2 C.B. 819,[3] petitioner argues that although the audit of his 1974 return had been completed, none of the procedures respondent has set for reopening closed ·files were followed. Thus, petitioner concludes that, as respondent failed to follow his reopening procedures and as petitioner was entitled to notice of a second inspection of his books of account under section 7605(b) but received none, the notice herein is invalid.

Respondent argues, of course, that there was no second inspection of petitioner's books of account within the meaning of section 7605(b) and that, even if there had been, such an inspection as occurred here would not render the deficiency notice invalid. Additionally, respondent argues that there was no failure on his part to follow his reopening procedures.

Section 7605(b) first appeared as section 1309 of the Revenue Act of 1921, 42 Stat. 310. The section was designed to protect the taxpayer from "onerous and unnecessarily frequent examinations and investigations of revenue agents." H. Rept. 350, 67th Cong., 1st Sess. 16 (1921), see also S. Rept. 275, 67th Cong., 1st Sess. 31 (1921), and H. Rept. 356, 69th Cong., 1st Sess. 55 (1926). The purpose of the section was to free honest taxpayers from the petty annoyances of repeated examinations. 61 Cong. Rec. 5855 (1921). See *United States v. Powell,* 379 U.S. 48, 54, 55 (1964). There is no indication anywhere in the legislative history that section 7605(b) and its predecessors were intended to restrict the scope of respondent's legitimate power to protect the revenue. *Collins v. Commissioner,* 61 T.C. 693, 699 (1974); *Benjamin v. Commissioner,* 66 T.C. 1084, 1098 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). The grants of power contained in section 7601 (power to canvas districts), and section 7602 (power to examine any books, records, etc.) are to be liberally construed in recognition of the vital public interest they serve. By the same token, the limitation in section 7605(b) is not to be construed so as to defeat that legitimate purpose. *Benjamin v. Commissioner, supra* at 1098, *DeMasters v. Arend,* 313 F.2d 79, 87 (9th Cir. 1963).

---

[3]Superseded by Rev. Proc. 74–5, 1974–1 C.B. 416.

To inspect petitioner's books of account would require, at a minimum, that respondent have access to and physically view taxpayer's books and records. *Benjamin v. Commissioner, supra* at 1098. But the parties have stipulated that no such second inspection of petitioner's books ever occurred. The fact that petitioner's brother had identical records with respect to the adjustments imposed herein, does not mean that an inspection of Solomon Grossman's books was the same as an examination of petitioner's books. Further, mere examination of the taxpayer's income tax return and accompanying schedules does not comprise a second inspection of petitioner's books within the meaning of section 7605(b). *Pleasanton Gravel Co. v. Commissioner*, 64 T.C. 510, 528 (1975), affd. 578 F.2d 827 (9th Cir. 1978).

Finally, petitioner argues that in asserting a deficiency herein, respondent reopened the case but failed to follow the procedures set out in respondent's Rev. Proc. 72–40, 1972–2 C.B. 819. We discussed and settled this issue in *Collins v. Commissioner, supra* at 701.[4] We have no difficulty in concluding that there was no second inspection of petitioner's books of account within the meaning of section 7605(b).

As will be apparent, respondent's victory on the section 7605(b) issue is a pyrrhic one. We next consider the question of whether petitioner is entitled to the claimed casualty loss deduction. The applicable portion of section 165 has remained unchanged since its enactment as part of the Internal Revenue Code of 1954. It read in relevant part as follows during the taxable year at issue:

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *

*  *  *  *  *  *  *

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—
    (1) losses incurred in a trade or business;
    (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * *

From 1960, and through the year before us, section 1.165–3(b) of the regulations read in pertinent part:

---

[4]See *Gardner v. Commissioner*, T.C. Memo. 1976–337.

(1) The * * * loss incurred in a trade or business or in a transaction entered into for profit and arising from a demolition of old buildings shall be allowed as a deduction under section 165(a) if the demolition occurs as a result of a plan formed subsequent to the acquisition of the buildings demolished. * * *

(2) If a lessor or lessee of real property demolishes the buildings situated thereon pursuant to the requirements of a lease or the requirements of an agreement which resulted in a lease, no deduction shall be allowed to the lessor under section 165(a) on account of the demolition of the old buildings. * * *

The antecedent case law and the background, and analysis, of the adoption of the above regulation was thoroughly explicated in *Landerman v. Commissioner*, 54 T.C. 1042, 1045–1047 (1970), affd. 454 F.2d 338 (7th Cir. 1971). Section 1.165–3(b)(2) above was amended by T.D. 7447, promulgated Dec. 21, 1976, 41 Fed. Reg. 55710, 1977–1 C.B. 51, to read as follows:

(2) If a lessor or lessee of real property demolishes the building situated thereon pursuant to a lease or an agreement which resulted in a lease, under which either the lessor was required or the lessee was required or permitted to demolish such buildings, no deduction shall be allowed to the lessor under section 165(a) on account of the demolition of the old buildings. * * *

Respondent argues in his brief that, regardless of whether the pre- or post–1976 version of regulations section 1.165–3(b)(2) is applied, the regulation:

requires only that the negotiation between the parties contemplated future demolition of the existing structures as a necessary condition to the fulfillment of the conditions of the anticipated lease, and that such demolition was clearly associated with the final agreement reached by the parties * * * regardless of whether the "agreement" came before or after the demolition.

In essence, respondent argues that it is irrelevant whether the agreement was entered into between the parties before or after demolition, so long as the negotiations contemplated demolition as a necessary underlying condition of a lease and such negotiations eventually resulted in a lease.[5] Of course, respondent is of the view that these requirements are met herein.

---

[5]We quote from respondent's main brief:

"It is respondent's position that a general or tentative agreement that the project will be pursued, even if such agreement is subject to conditions involving financing or the procurement of required permits or licenses, or even if such tentative agreement is subject to further negotiations, is sufficient where the owner of the property, in hope or anticipation of a successful completion of the deal, goes ahead and demolishes the existing structures. It is respondent's position that such agreement is sufficient even though there is the distinct possibility that the hoped for lease will not come to fruition. The agreement must, of course, eventually result in a lease for the regulation to apply."

Petitioner argues, on the other hand, that there was no lease or agreement which resulted in a lease at the time the Grossmans made their decision to demolish the Gregory Avenue buildings. Further, he argues that there was no such lease or agreement at the time the demolition was carried out or at the time it was completed. Thus, contends petitioner, the claimed deduction is not caught in the web of regulations section 1.165–3(b)(2). In addition, petitioner argues that: (1) The amendment to regulations section 1.165–3(b)(2) should not be applied retroactively, but that (2) even if it is applied retroactively, the claimed deduction is allowable. This is because, states petitioner, the deduction did not occur pursuant to an agreement which resulted in a lease under which petitioner as lessor was *required* to demolish the buildings.

Since we accept petitioner's position that he is entitled to the demolition deduction whether or not the 1976 amendment to the regulations is retroactive, we need not face the retroactivity issue.

We do not agree with respondent that the mere hope or anticipation of a land owner that demolition of a building will facilitate a lease is sufficient to render the demolition a capital event. Obviously any owner who demolishes a building, does so with the hope that he has made a sound financial decision, even if he does so with a view to "cutting his losses." Respondent's argument would deny the land owner his loss, if he is successful in obtaining a lease, merely because his financial decision turns out to be sound.

We believe that there must be a definite link between the demolition and the lease. In *Landerman,* we said that the demolition must have been "sufficiently within the contemplation of the parties at the time the lease arrangements were made [so] that it can be said that the demolition was an essential underlying condition of those arrangements." *Landerman v. Commissioner, supra* at 1047. The regulations state the same rule, and we do not believe that the 1976 amendment to the regulations made any change in this respect insofar as the lessor is concerned. For a lessor's claimed demolition deduction to be denied, demolition must have been "required," i.e., been an essential condition of the parties' "arrangements" at the time the lease "arrangements" are made; "arrangements" meaning the lease or the agreement which resulted in the lease.

We do not say that there must be a formal agreement per se, for if there was an agreement in substance, the deduction should be disallowed. Yet there must be the substance of an agreement at the time the demolition is conceived and carried out, otherwise the regulation does not work to deny deduction. The mere fact of a lease agreement, unrelated by more than mere hope to a demolition, is insufficient to render the loss a capital expenditure.

In our case, the facts reveal a total absence of any relationship between the demolition and later lease. There was not even the hope of an agreement between the Grossmans and Morrow because, while the decision to demolish was made in the latter part of July, the negotiations between the parties collapsed on July 2. Further, at the time of demolition, there was no agreement or hope of agreement. That is why the lease itself contemplates erection of a building by the Grossmans and why demolition is not even mentioned. Demolition was already an accomplished fact when negotiations resulting in the lease occurred.

While the Grossmans were certainly not unaware that once the lot was cleared they could put a new building on it, the rule of section 1.165–3(b)(1), Income Tax Regs., acknowledges that such knowledge is not fatal. It seems to us that the Grossmans viewed the demolition with mixed emotions. They had tried to arrange a lease for the old buildings reconstructed. This was cheaper and perhaps quicker. Yet no such prospect was, apparently, on the horizon in 1974. On the other hand, the presence of the buildings on the Gregory Avenue property was a constant source of mounting financial losses and legal dangers. The Grossmans lived in daily fear that someone would injure themselves on the abandoned property, that the building would catch fire, etc. These fears and considerations were the immediate cause of the demolition. Because there was no agreement to lease or demolish, the demolition could not be pursuant to any sort of a requirement of an agreement. The loss is deductible. See *Yates Motor Co. v. Commissioner*, 561 F.2d 15, 18 (6th Cir. 1977), revg. a Memorandum Opinion of this Court.

*Decision will be entered under Rule 155.*