M. J. BYORICK, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MICHAEL J. BYORICK AND MARY M. GREGG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M. J. Byorick, Inc. v. Commissioner
Docket Nos. 33356-85; 33357-85.
United States Tax Court
T.C. Memo 1988-252; 1988 Tax Ct. Memo LEXIS 281; 55 T.C.M. (CCH) 1037; T.C.M. (RIA) 88252; June 7, 1988; As amended June 13, 1988 Bruce E. Rosenblum, Joseph D. Sullivan, and McGee Grigsby (specially recognized), for the petitioners. J. Darrel Knudtson, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in income tax for petitioner M. J. Byorick, Inc. *282 for the years ending and in the amounts as follows: Year Ending *
Deficiency
1-31-78
$ 15,299.38
1-31-79
$  1,972.96
1-31-82
$  5,723.42
and for the individual petitioners Michael J. Byorick and Mary M. Gregg [1] for the years ending and in the amounts as follows: Year Ending
Deficiency
12-31-77
$ 493,675.00
12-31-78
$ 372,468.94
12-31-79
$  96,775.00
12-31-80
$  10,383.00
12-31-81
$   3,678.00
*283 The parties disposed of all adjustments giving rise to the deficiencies determined in the statutory notice to the individual petitioners for the years 1980 and 1981 by agreement. However, by amendment to answer filed at the beginning of the trial, respondent alleged that petitioner Michael J. Byorick received either directly or indirectly in taxable years 1980 and 1981 amounts from M. J. Byorick, Inc. which are taxable to him as constructive dividends. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the following: (1) Whether respondent conducted a second inspection of the books of account of Michael J. Byorick for the year 1977 without notification as required by section 7605(b); [2]
(2) Whether funds advanced from M. J. Byorick, Inc. (the Company) to Michael J. Byorick (petitioner) during taxable years 1977, 1978, and 1979 should be characterized as loans or as constructive dividend income; (3) Whether funds advanced during 1977, 1978, and 1979 by the Company to certain entities in which petitioner owned an interest constituted constructive dividend income to petitioner; (4) If we conclude that the advances *284 by the Company to petitioner were loans, whether the Company has additional income for its fiscal years ending January 31, 1981, and 1982 for accrued interest on the loans made to petitioner; and (5) Whether the Company made advances to petitioner directly or indirectly in 1980 and 1981 which constituted constructive dividends to petitioner. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. M. J. Byorick, Inc., a District of Columbia corporation (the Company) is an accrual basis taxpayer with a fiscal year ending January 31. It filed its corporate Federal income tax returns for its fiscal years ending January 31, 1977 through 1982 with the Internal Revenue Service Center in Memphis, Tennessee. Michael J. Byorick, a resident of Fairfax, Virginia at the time of filing of the petition herein, and Mary M. Gregg, a resident of Centerville, Virginia at the time of filing of the petition herein, filed joint Federal income *285 tax returns with the Internal Revenue Service Center in Memphis, Tennessee for the taxable years 1977, 1978, 1979, 1980 and 1981. Petitioner formed the Company in July 1965 with $ 10,000 which he borrowed from the Bank of Rosslyn. The business of the Company prior to and during the years in issue was the installation of reinforcing structural steel in buildings and other construction projects in the Washington, D.C. area. The Company, a Union contractor, conducted a successful business into early and mid-1970. Several factors contributed to a decline in the Company's business in late 1970: (1) The percentage of work the Company did for the government decreased due to minority contracting requirements, (2) the Company's business decreased substantially when the percentage of non-union contracting increased, and (3) petitioner experienced health problems beginning in 1978 which continued into 1980. Between February and June 1980 petitioner was unable to work and when he returned he could only work several hours a day. Petitioner was the President of the Company and its sole stockholder from its inception throughout the years here in issue. For 1977, 1978 and 1979 petitioner *286 received $ 84,250, $ 84,250, and $ 55,272 as salary from the Company. The Company had a small office with space for only its three office employees, petitioner, Charles "Buck" Deacon, the Company bookkeeper, and Sally Bohn, petitioner's secretary. Petitioner had no accounting or financial training and did not personally maintain the Company's books and records. Mr. Deacon actually maintained the Company's books and records while Ms. Bohn prepared the Company payroll, reconciled bank statements, wrote Company checks, maintained the Company's checkbook, and handled Company invoices, receipts and deposits. Mr. Deacon and petitioner would consult an accountant with respect to bookkeeping matters and petitioner consulted this accountant with respect to his personal financial matters. After petitioner consulted his accountant, the Company advanced money to him beginning in 1973. The amounts advanced by the Company to petitioner were invested by him in income-producing ventures from which he expected to obtain proceeds for repayment of the advances. These advances were shown on the Company books as loans and were evidenced by promissory notes executed by petitioner. As of *287 February 1, 1976, petitioner's outstanding loan balance as shown on the Company books was $ 676,000, [3] evidenced by eight promissory notes in the following amounts:
$ 400,000
37,500
40,000
30,000
5,000
5,000
150,000
9,500. These balances were after amounts shown on the Company books during the years 1973 through 1975 as loan repayments of $ 395,536.74. Petitioner made regular payments to the Company designated as interest at 6 percent as follows: With respect to the $ 400,000 note of November 5, 1975: February 5, 1976
$ 6,000 (check for $ 6,450)
May 5, 1976
6,000 August 4, 1976
6,000 November 3, 1976
6,000
$ 24,000 (6% of $ 400,000)
With respect to the $ 37,500 note of November 24, 1975 and $ 40,000 note of November 25, 1975: February 26, 1976
$ 1,162.50  May 24, 1976
1,162.50  August 23, 1976
1,162.50  November 19, 1976
1,162.50  $ 4,650.00  (6% of $ 77,500)
With respect to the $ 30,000 note of January 20, 1976 and $ 5,000 note of January 14, 1976: April 20, 1976
$ 525.00  July 20, 1976
525.00  October 21, 1976
525.00  $ 1,575.00  February 5, 1976
450.00  (of $ 6,450 check above)
January 12, 1976
87.48  (quarterly 7% interest
of $ 5,000 note)
$ 2,112.48  (approx. 6% of $ 35,000)
*288 With respect to the $ 5,000 note of December 30, 1975, $ 9,500 note of December 28, 1975, and $ 150,000 note of December 28, 1976: June 28, 1976
$ 2,392.50  September 30, 1976
2,397.50  December 29, 1976
2,377.50  April 1, 1976
3,925.00  $ 11,092.50  (representing interest
of 6% on $ 155,000 and on the declining
balance of the $ 9,500 note)
On January 1, 1977 petitioner's loan balance to the Company was $ 751,000. On January 27, 1977, petitioner borrowed $ 715,000 at 7.27-percent interest from the Bank of Virginia on an unsecured basis. On January 27, 1977, petitioner paid $ 722,608.49 to the Company, representing $ 715,000 in principal and $ 7,608.49 in interest. On February 2, 1977, the Company advanced $ 715,000 to petitioner. That amount was recorded as a loan on the Company books and records and was evidenced by petitioner's promissory note payable to the Company in ninety days. Petitioner used that advance to pay off the Bank of Virginia loan on February 3, 1977. During 1977 and 1978 petitioner received unsecured 90-day bank loans from the Bank of Virginia in the amounts of $ 20,000, $ 40,000, and $ 37,000. *289 The $ 20,000 note was executed in November 1977, was renewed in February 1978, renewed again in June 1978 and paid off in July 1978. The $ 40,000 note was executed on August 1, 1977, renewed in December of 1977, further renewed in February and May of 1978, and paid off in July 1978. The $ 37,000 note was executed in November 19977, renewed in February and May of 1978 and paid off in July 1978. Ms. Bohn worked for the Company from September 1972 until June 1980. She worked with petitioner on a daily basis and was aware that he borrowed money from the Company. Petitioner always referred to the advances as loans, always knew when interest was due and made arrangements to pay it and paid on the loan principal. Ms. Bohn was aware of petitioner's insistence upon executing promissory notes for the amounts advanced by the Company to him. Petitioner discussed with Ms. Bohn his intention to pay the notes with proceeds of his investments. Financial statements during the years in issue filed by petitioner with various financial institutions showed assets, liabilities and net worth in the following amounts on the dates indicated: Date
Total Assets
Total Liabilities
Net Worth
1-31-78
5,065,876.85
1,003,470.65
4,062,406.20
3-31-78
3,345,239.00
1,003,470.65
2,341,769.25
12-31-79
2,165,686.00
908,867.00
1,256.819.00
4-30-80
3,548,221.00
1,170,569.00
2,377,652.00
1-30-81
2,827,257.00
1,129,250.00
1,698,007.00
5-15-82
3,359,465.00
1,077,022.00
2,273,443.00
*290 The major assets and liabilities shown on these statements were as follows at the dates indicated: >100> >101> Notes
Partnership
Date
Unlisted Stock
Receivable
Interests
1-31-78
1,159.808.00-MJB, Inc.
325,072-Catalpa
2,009,561.98-
15,000-Shamrock
Rector & Byorick
3-31-78
1,726,095.00
859,413.84
12-31-79
2,030,633.00
18,977.00
4-30-80
3,052,756.00
1-30-81
1,729,715.00
491,332-Dano
5-15-82
3,004,552.00
579,231-Dano
295,350.00
Notes
Date
Payable
1-31-78
105,629.00-BK VA
897-841.65-MJB, [Illegible Word]
3-31-78
105,629.00-BK VA
897,841.65-MJB, [Illegible Word]
12-31-79
908,867.00-MJB, [Illegible Word]
4-30-80
908,867.00
1-30-81
1,111,700.00 *
5-15-82
1,077,022.00 In addition to the transaction concluded February 2, 1977, the Company made the following advances to petitioner in 1977 totalling $ 51,000: Feb.  8, 1977
$ 20,000
Jun. 14, 1977
9,000
Jun. 22, 1977
10,000
Dec.  2, 1977
5,000
Dec. 16, 1977
7,000
All these advances were recorded as loans on the *291 Company's books and evidenced by petitioner's promissory notes. On November 8, 1977, petitioner gave a promissory note to the Company in the amount of $ 10,000 stated to represent interest payable on loans from the Company. Petitioner used the $ 51,000 advanced during 1977 as follows: Entities in Which
Amount
Invested
$ 20,000
Time Flight Aviation
19,000
Shamrock Manufacturing
5,000
Dano Resource Recovery
7,000
Catalpa Hills Development
During 1978 the Company made advances to petitioner totalling $ 217,489.49, as follows: Mar. 31, 1978
$ 4,000   Apr. 11, 1978
2,000   Apr. 14, 1978
3,000   May   5, 1978
2,000   Jun.  2, 1978
4,000   Jun. 16, 1978
4,500   Jun. 22, 1978
5,000   Jul. 27, 1978 [4]
98,989.49
Aug.  1, 1978 [5]
30,000   Oct.  3, 1978
2,500   Oct. 13, 1978
10,000   Oct. 20, 1978
1,000   Oct. 25, 1978
1,000   Oct. 30, 1978
7,500   Nov.  2, 1978
10,000   Nov.  2, 1978
1,500   Nov. 14, 1978
10,000   Nov. 30, 1978
12,500   Dec.  4, 1978
4,000   Dec. 15, 1978
4,000   *292 All these advances were recorded as loans on the Company's books and all except the $ 1,500 advance on November 2, 1978, were evidenced by petitioner's promissory notes to the Company. On February 3, 1978, and May 9, 1978, petitioner issued promissory notes to the Company in the amounts of $ 20,000 each stated to represent interest payable on loans from the Company. Petitioner used the $ 217,489.49 advanced during 1978 as follows: Entities in Which
Amount
Funds Invested
49,000      Dano Resource Recovery
40,500      Catalpa Hills Development
3,000      Skyline Industries
at least 3,500      Shamrock Manufacturing
10,000      Byorick, Chilstrom & Wayne
5,000      Time Flight Aviation
98,989.49   *
1,000      Advanced Travel Tours
6,500      Other uses. **
As of January 31, 1978, the Company's books and records showed advances had been made to Advanced *293 Travel Concepts and Advanced Travel Tours, Inc. in amounts greater than the amounts repaid by $ 44,092.99 and $ 20,341.65, respectively. On January 31, 1978 an accounting adjustment was made on the Company's books whereby the outstanding balance from the above two accounts was posted to petitioner's loan account. The Company made adjustments to its rental account during 1978 which increased petitioner's loan account by the amount of $ 420 on July 19, 1978, and by the amounts of $ 200 and $ 1,400 on August 29, 1978. The Company's loan balances as of December 31, 1978 reflect 1978 entries for the following entities in the following amounts: Dano Resource Recovery
* $ 165,039.25
Shamrock Manufacturing
$  20,060.  During 1979 the Company made the following advances to petitioner totalling $ 95,890.81: Date
Amount
Jan.  3, 1979
$ 12,500   Jan. 12, 1979
7,300   Jan. 19, 1979
1,000   Apr.  2, 1979
3,250   Apr.  6, 1979
3,000   Apr. 24, 1979
3,500   Apr. 30, 1979
5,000   May  11, 1979
1,500   May  14, 1979
2,000   May  14, 1979
23,000   May  18, 1979
500   Jun.  8, 1979
4,000   Jun. 15, 1979
4,000   Jun. 19, 1979
3,996.34
Jun. 19, 1979
1,600   Jun. 22, 1979
1,000   Jun. 23, 1979
1,700   July  6, 1979
1,400   July 11, 1979
2,000   July 13, 1979
1,652   July 18, 1979
309.42
July 20, 1979
1,000   Aug. 17, 1979
1,000   Sep. 28, 1979
1,000   Sep.  4, 1979
336   Sep. 10, 1979
1,252.49
Oct. 10, 1979
3,000   Oct. 12, 1979
1,500   Nov.  1, 1979
1,000   Dec.  1, 1979
1,594.56
*294 All these amounts, except the September 10, 1979 advance of $ 1,252.49, were recorded on the Company books as loans to petitioner and, all except the advance of $ 336 on September 4, 1979, were evidenced by petitioner's promissory note to the Company. Petitioner used the $ 95,890.81 advanced during 1979 as follows: Entities in Which
Amount
Funds Invested
$ 32,252      Dano
13,600      Shamrock [insolvent in 1978]
5,000      Catalpa Hills Development
at least 20,000      Payments to loan account.
25,038.81   Other uses. *
On January 31, 1979, the Company made yearend accounting adjustments to petitioner's loan account in the following amounts: $ 41,263.79  previously listed as loan balance of
H&M Builders ($ 30,000 of which was
previously included in petitioner's
1978 advances);
$ 50,153.93  previously listed as loan balance of
Byorick, Chilstrom & Wayne;
$ 11,854.00  representing accrued interest on loans
owed to the Company.
The Company's records reflect calendar 1978 payments with respect to *295 petitioner's loan account in the amount of $ 57,538.30 allocated as follows: Jan. 31, 1978
$ 555.50
principal
Feb. 28, 1978
2,592.99
principal
Apr. 19, 1978
5,667   principal
Jun. 30, 1978
23,000   interest (so
allocated by Jan. 31,
1979 adjustment)
Jul.  7, 1978
5,186.81
principal
Jul.  7, 1978
7,000   principal
Aug. 19, 1978
13,000   interest (1/31/79
adjustment)
Oct. 31, 1978
536   principal
The Company's records reflect calendar 1979 payments with respect to petitioner's loan account in the amount of $ 70,756.91 allocated as follows: Apr. 12, 1979
$ 25,000   interest Apr. 18, 1979
4,000   principal
May  16, 1979
20,000   principal
Jul.  6, 1979
8,500   principal
(additional $ 500 principal
credited that date)
Aug.  6, 1979
6,000   principal
Sep. 10, 1979
1,000   principal
Oct. 17, 1979
1,000   principal
Nov.  1, 1979
1,500   principal
Nov.     1979
3,256.91
principal
On January 31, 1979 petitioner's loan balance was credited in the amount of $ 22,787.85. The Company's records reflect calendar 1980 *296 payments with respect to petitioner's loan account in the amount of $ 217,700 allocated as follows: Jan. 16, 1980
$ 175,000
principal
Jan. 16, 1980
25,000
interest Nov.  6, 1980
3,500
principal
Nov.  7, 1980
500
principal
Nov. 14, 1980
7,200
principal
Nov. 30, 1980
6,500
principal
Petitioner's loan balance was also credited during 1980 in the following amounts: $ 1,500 on January 31, 1980 and $ 1,179.51 on February 1, 1980. The Company's records reflect calendar 1981 payments with respect to petitioner's loan account in the amount of $20,900 allocated as follows: Feb. 12, 1981
$1,000
principal
Mar. 27, 1981
3,400
principal
Apr.     1981
4,500
principal
Aug.  7, 1981
2,000
principal
Oct.     1981
5,000
principal
Apr. 30, 1981$5,000
interest The Company's records reflect calendar 1982 payments with respect to petitioner's loan account in the amount in the amount of $ 10,300 principal. [6]
*297 Shamrock Manufacturing Co., Inc. (Shamrock) was a Virginia corporation incorporated in 1976. Shamrock was established for the purpose of manufacturing children's toys and related products for distribution throughout the United States. During the course of 1977 and 1978, petitioner made loans to Shamrock. On or about March of 1977, petitioner acquired 20 percent of the stock of Shamrock. In February of 1978, petitioner increased his stock ownership to 40 percent. Petitioner also guaranteed loans to Shamrock from various lenders. Shamrock subsequently experienced difficulty in meeting its financial obligations and ceased operations in October of 1978. Rector and Byorick was a partnership formed by Charles W. Rector and petitioner also firmed a partnership to conduct the business of developing and marketing 236.79 acres of land in the town of Culpeper, Virginia (the Culpeper property) under the name of Catalapa Hills Development (Catalpa). The Culpeper property was purchased for $ 2,329.066 on November 28, 1973. At petitioner's request, Mr. Rector, who maintained the property records, prepared reports projecting the value of the Catalpa property. As of February 11, 1976, petitioner's *298 one-half interest in the property was valued at $ 2,023,386.00. As of October 13, 1976 his interest was valued at $ 2,010.132. Petitioner relied on Mr. Rector for financial information concerning the Catalpa and Rector and Byorick partnerships. Petitioner did not review the property records but relied upon Mr. Rector's expertise as a general contractor to prepare accurate financial projections on the development of the Catalpa property. Petitioner used the financial information providded by Mr. Rector on his personal financial statements. Petitioner reviewed this information to determine the value of his interests in the property held by Catalpa and Rector and Byorick. Petitioner believed these figures were accurate and a fair valuation of his interest. In January of 1979, the partnership received an offer from Charandee Corporation of Manassas, Virginia to purchase the Culpeper property for $ 2,900,000. Due to subsequent disputes between the parties, the sales contract was never consummated. On September 27, 1979, Mr. Rector filed suit in the Circuit Court of the County of Culpeper to dissolve the partnership. Petitioner sold his interest in Catalapa Hills Development *299 and the Culpeper property to Mr. Rector for the sum of $ 400,000 and relief from liabilities on December 31, 1979. Petitioner agreed to accept this amount due to his financial and health problems at the time. Petitioner used the $ 400,000 proceeds received from this sale as follows: (a) $ 200,000 was paid to the Company -- $ 175,000 in repayment of principal and $ 25,000 in payment of interest on the Company's loans to him. (b) $ 167,641 was used to repay indebtedness of the Mary M. Byorick Trust to the Bank of Virginia with respect to a 1972 loan, the proceeds of which were used for investment in the Catalpa property. (c) $ 12,500 was used to pay attorneys' fees relating to the sale. (d) $ 17,496.34 was used to repay indebtedness of Shamrock Manufacturing Co., Inc. which petitioner had guaranteed. Dana Resource Recovery, Inc. (Dano) was incorporated in 1976 in the State of Delaware. Dano was formed to conduct the business of disposing of solid waste and sludge and producing and selling compost derived from solid waste and sludge. In December 1977, petitioner loaned $ 5,000 to Dano for use as operating capital, put up a bond to allow Dano to bid on a contract, *300 and agreed to purchase 26 percent of the stock of Dano. This stock was issued to petitioner during 1978. Petitioner made subsequent loans to Dano during 1978 and 1979, and thereafter. In November 1977, the District of Columbia (the District) issued to Dano, and other selected contractors which like Dano had previously submitted acceptable proposals, invitations to bid for long-term contracts to dispose of sludge and solid waste. On December 12, 1977 and January 9, 1978, Dano submitted its responsive bids for these two contracts. On March 31, 1978, the District informed Dano, in a letter from its Director of General Services, that Dano was the lowest responsive bidder. In late 1977, petitioner reviewed profit projections prepared for Dano by its President, William Metcalf, which projections reflected the anticipated profits Dano would earn in the event contracts for disposal of sludge and solid waste were awarded to it by the District. These projections, as revised slightly in early 1978, showed after-tax profits for each of the five years of the District of Columbia contracts as follows: Year 1  -
$ 1,530,925
Year 2  -
1,753,252
Year 3  -
1,983,907
Year 4  -
2,223,398
Year 5  -
2,472,260
*301 Petitioner considered these projections to be important factors in his decision to loan money to and invest in Dano. Subsequent profit projections, prepared in connection with a 1980 offering memorandum, and based on anticipated increased revenues, reflected after-tax profit for each of the five years of the contract as follows: Year 1  -
$ 1,769,069
Year 2  -
1,406,484
Year 3  -
2,364,433
Year 4  -
3,390,741
Year 5  -
4,911,214
On January 16, 1979, Dano obtained a five-year contract with the District for the disposal of sewage sludge. This contract called for payments to Dano of $ 20,006,562.50 over a five-year period. On February 9, 1979, Dano obtained a five-year contract with the District of Columbia for the disposal of solid waste. This contract called for payments to Dano of $ 14,742,000 over a five-year period. At the time these contracts were awarded, Petitioner owned 26 percent of the stock of Dano. At that time petitioner valued his 26,000 shares of Dano stock at $ 100 per share because it was selling to others for that price. During 1979, property was acquired in King George County, Virginia (the King George site) for use as *302 the site of the Dano Facility for disposal of sludge and solid wastes and production of compost. The Commonwealth of Virginia, however, obtained an injunction from the U.S. District Court for the Eastern District of Virginia on March 5, 1979, and a second restraining order on July 20, 1979, which prevented Dano from proceeding with construction of its plant at the King George site. In response to the restraining order preventing further construction at the King George site, the District in August of 1979 extended the time for completion of the plant from August 1, 1979, to November 1, 1980. On July 23, 1980, Dano and the District entered into a Supplemental Agreement which designated the Blue Plains Wastewater Treatment Plant (the Blue Plains site) as the site for the waste and sludge disposal facility. The estimated payments to Dano under the contract for sludge disposal under the Supplemental Agreement increased to $ 39,425,000. The estimated payments to Dano under the contract for solid waste disposal under the Supplemental Agreement increased to $ 19,656,000. The estimated payments under both contracts totaled $ 59,081,000. Petitioner's stock ownership in Dano decreased *303 shortly prior to the date of the Supplemental Agreement from 26 percent to 23 percent, due to the issuance of stock to additional persons. On April 29, 1981, the District terminated the contract with Dano for alleged anticipatory breach of contract. Shortly thereafter, Dano commenced litigation against the District in the Superior Court of the District of Columbia (Civil Action No. 15683-81). In addition, on May 28, 1981, Dano filed a notice of appeal of the contract termination with the Contract Appeals Board of the District of Columbia (CAB No. C-CC-1-0649). Settlement negotiations resulted in the award of a new contract to Dano dated March 3, 1982 (Contract No. 0359-AA-23-0-2-MR), which called for payments to Dano of $ 1,008,000 during the 90-day demonstration phase of the contract, and $ 77,048,913 over the five-year term of the new contract. The five-year contract and associated payments were conditioned on successful completion of the demonstration phase of the contract. In the demonstration phase of this contract, Dano was required to build and operate two biostabilizer tubes and to meet certain objective operating criteria. On May 6, 1982 Dano entered into a joint *304 venture for performance of the District contract, and in connection therewith entered into an Agreement to pay certain "priority expenses" to various persons, including petitioner. This Agreement stated that petitioner was entitled to receive priority payments of $ 744,971.09, less the principal amount of a $ 111,971.09 note which was to be returned to him. On or around June of 1982 Dano undertook the construction of two biostabilizer tubes at the Blue Plains site which were to be operated for demonstration purposes in accordance with the March 3, 1982 contract. The 90-day demonstration phase of the contract was completed successfully, and on January 31, 1983, the District authorized Dano to proceed with the construction of the remainder of the plant. Dano continued construction of the remainder of the plant, but on May 6, 1983, [7] the District terminated the contract for alleged failure to perform services within the time specified by the contract. On April 25, 1983, [8]Dano filed a Notice of Appeal of the decision of the Contracting Officer with the District of Columbia Contract Appeals Board. On September 7, 1983, Dano filed its complaint in the case before the Contract *305 Appeals Board. At the time of trial the matter was pending before the Contract Appeals Board. On January 6, 1978, the Company loaned Dano $ 30,000, evidenced by Dano's promissory note in such amount payable to the Company. On July 13, 1979, the Company sold real property owned by it on North Fayette Street, Alexandria, Virginia, to Alexandria Two Associates (Alexandria Two). As part of the closing on this sale, $ 71,499.13 was paid to the King George County Land Trust (Hugh Shafer, trustee), and $ 61,540.12 was paid to Services National Bank. This aggregate amount -- i.e., $ 133,039,25 -- was recorded as a loan to Dano on the Company's books and records pursuant to a September 30, 1979 adjustment. At the closing of the sale of the North Fayette Street property, a $ 111,576 deed of trust note (payable in 1984) was executed by Alexandria Two to the order of the Company. On July 13, 1979, Dano executed a promissory note payable to the order of the Company in the amount of $ 244,615.25 -- the amount of the $ 133,039,25 loaned to Dano on that date, plus $ 111,576. *306 Time Flight Aviation, Inc. (Time Flight) was a corporation formed by George Sloan in or around late 1976. The proposed business of Time Flight was to transport passengers who had flown to the United States on the Concorde from Dulles Airport to Washington National Airport by helicopter. Time Flight had entered into an agreement with Air France to transport passengers. In January of 1977, petitioner entered into an agreement to loan $ 30,000 to Time Flight, and obtained a 25-percent stock interest in Time Flight. Skyline Industries, Inc. (Skyline) was a Florida corporation formed in 1973 to engage in the steel reinforcement business. Richard Webb owned 50 percent of its stock and petitioner owned 50 percent of its stock. Advanced Travel Concepts, Inc. (ATC) was a travel agency incorporated in Virginia in 1975. In July of 1975 petitioner acquired 20 percent of the issued ATC stock. His interest increased to 26 percent in March of 1976. Advanced Travel Tours, Inc. (ATT) was a travel agency incorporated in Virginia in 1977. Petitioner owned less than 10 percent of the stock of ATT. Byorick, Chilstrom and Wayne was a joint venture of three companies formed by verbal *307 agreement in 1974 to perform the steel reinforcement on the Metro subway station at 12th Street in Washington, D.C. M. J. Byorick, Inc. was a one-third owner and participant in the joint venture. Wayne Steel Erectors, Inc. and Chilstrom Steel Erectors, Inc. each was a one-third owner and participant in the venture. After this job was completed, the venture was wound up. H&M Builders, Inc. (H&M) was a Virginia corporation formed about 1975 to engage in business as a general contractor. Petitioner owned 49 percent of the stock of H&M. Byorick Associates was a limited partnership, formed in December 1972, of which Michael J. Byorick was the sole general partner and the Mary M. Byorick Trust (the Trust) was the sole limited partner. Petitioner contributed 33-1/3 shares of his stock in the Company (representing one-third of the Company's shares) to Byorick Associates, and the Trust contributed the proceeds of a $ 250,000 loan to it from the Bank of Virginia. This $ 250,000 was subsequently used to partially fund the purchase of the Catalpa property in Culpeper, Virginia. Byorick Associates did not conduct any operations. The Trust was formed for the benefit of petitioner's *308 wife and children in December 1972. It engaged in no activity other than (1) borrowing $ 250,000 from the Bank of Virginia in December 1972, (2) contributing such funds to Byorick Associates, and (3) servicing and repaying the Bank of Virginia loan. In addition to paying interest on the Bank of Virginia loan, the Trust made repayments of principal to the Bank of Virginia in the amounts of $ 70,000 and $ 25,000 in April 1975 and January 1976, respectively. In January 1980, the Trust received $ 167,641.81 from the sale of Catalpa, which was used to repay the $ 155,000 balance of the Bank of Virginia loan plus accrued and unpaid interest. The Trust was subsequently dissolved. In February 1979, petitioner sold his interest in the Rector and Byorick partnership, and in second deeds of trust held by that partnership to Charles Rector, for the sum of $ 120,000. The proceeds received by petitioner from this sale were used as follows: (a) $ 57,917.75 was paid to the Bank of Virginia in connection with petitioner's obligations to the bank. (b) $ 20,614.39 was paid with respect to indebtedness of Shamrock Manufacturing Co., Inc. quaranteed by petitioner. (c) $ 25,045.41 was advanced *309 to Dano or to others on behalf of Dano. (d) $ 3,200 was advanced to Catalpa Hills Development. (e) $ 8,166.20 was paid to Investex Company Regional 106, a real estate partnership in which petitioner held an 11-percent interest, in satisfaction of petitioner's obligation to make periodic capital contributions. (f) $ 3,252 was paid to the Commonwealth of Virginia for taxes. (g) $ 804.25 went to pay other expenses. In October 1980, Deskin Toyota, Inc., of which petitioner was a 49-percent shareholder, sold its assets in exchange for the promissory notes of Anton Schmidt. These notes were distributed to Deskin Toyota's shareholders in a complete liquidation. The notes received by petitioner provided for quarterly payments of approximately $ 15,000, representing principal and interest. The first such payment was received by petitioner on November 7, 1980, $ 7,700 of which was paid by petitioner to the Company. On November 5, 1980, petitioner entered into a letter agreement pursuant to which he committed to pay $ 7,500 or approximately half, of each quarterly payment received on these notes to Leasing Systems, Inc. in satisfaction of a $ 115,320 judgment that had been entered *310 against him in favor of Leasing Systems, Inc. Leasing Systems, Inc. was a corporation which had provided financing to Dano. Petitioner complied with the terms of this letter agreement, making regular payments on the Leasing Systems judgment until it was fully paid. In May of 1980, petitioner disposed of his interest in the Byorick and Chatman partnership for $ 31,000, which was paid directly to American Roll Formed Products Corp. in satisfaction of a judgment entered against petitioner. This judgment was entered on the basis of petitioner's guarantee of obligations of Shamrock Manufacturing Co., Inc.
Revenue Agent Hugh Henderson (Agent Henderson) conducted the audit of the Company's returns for fiscal years ending January 31, 1977 and January 31, 1978. In conjunction with his examination of the Company and in keeping with standard procedure, Agent Henderson examined petitioner's related return for 1977. He did not conduct an examination of petitioner's books and records for its 1977 taxable year, but rather proposed adjustments from his examination of the return. In April 1979, petitioner consented to certain adjustments proposed by Agent Henderson. One of the adjustments *311 made as a result of the examination was to disallow $ 10,000 of the $ 50,511 interest expense claimed by petitioner based on payments made in connection with the Company's loans to petitioner. Revenue Agent W. Thomas Miller (Agent Miller) was assigned to examine petitioner's 1978 return in conjunction with petitioner's filing an amended return for 1978. This examination commenced in October 1980. Agent Miller examined petitioner's 1978 books of account, but he did not examine his 1977 books and records. When Agent Miller concluded that 1977 should be reopened he sought approval from the District Director. Agent Miller made adjustments to petitioner's tax as reported for 1977 from petitioner's return and the books and records of the Company. He informed petitioner of the adjustments made. One of the adjustments proposed was an increase to the Company's interest income based upon interest accrued on the Company's loans to petitioner. The Company had accumulated earnings and profits since its inception in the following amounts (without taking into consideration proposed adjustments as set forth in the statutory notice of deficiencies) as of the close of its fiscal years stated *312 below: (a) As of January 31, 1977 -- $ 1,300,855.99 (b) As of January 31, 1978 -- $ 1,288,393.17 (c) As of January 31, 1979 -- $ 1,323,248.43 (d) As of January 31, 1980 -- $ 1,564,822.82. Since the Company's inception, it has paid a total of $ 304,661.40 in dividends, as follows: (a) $ 13,661.40 paid on December 31, 1972. (b) $ 150,000 paid on December 31, 1973. (c) $ 75,000 paid on December 30, 1975. (d) $ 66,000 paid on April 14, 1977. Respondent in his notice of deficiency determined that the amounts shown as loans to petitioner and to the various entities in which petitioner had an interest for the years 1977, 1978, and 1979, were in fact constructive dividends to petitioner. Respondent determined in the alternative, that the Company had not reported all interest accrued on loans made to petitioner. By Amendment to Answer respondent claimed that amounts shown on the Company's books as loans to petitioner and entities in which petitioner had an interest were constructive dividends to petitioner in 1980 and 1981. He claimed such dividends were taxable to petitioner to the extent that there remained earnings and profits of the Company after reduction by the *313 constructive dividends to petitioner which are determined for the years 1977, 1978, and 1979. OPINION
I. Section 7605(b)
Petitioner contends that any deficiency for his taxable year 1977 is improper since it was based upon a second inspection of his books of account in violation of the provisions of section 7605(b). [9]Section 7605 prohibits respondent from making more than one inspection of a taxpayer's books of account unless respondent notifies the taxpayer of the necessity of such inspection. Petitioner contends that the second inspection of 1977 was improper because respondent audited the 1977 year in 1979 making adjustments at that time which in effect treated the advances as loans. According to petitioner, the subsequent audit which began in October 1980, in which respondent questioned the nature of the advances, was improper.
*314 Respondent contends that the adjustments made to petitioner's 1977 income in the 1979 audit did not result from an inspection of petitioner's books of account, that the 1980 audit did not constitute such an inspection, and that petitioner consented to an inspection of his books of account in the 1980 audit. From the evidence, we conclude that the adjustments to petitioner's 1977 income by respondent's agent in 1979 did not result from or constitute an inspection of petitioner's books of account. By examining petitioner's individual return for 1977, respondent's agent in 1979 was merely following the standard procedure of a corporate examination of examining related returns. Examination of a taxpayer's returns and their accompanying schedules does not constitute an inspection of taxpayer's books of account. Benjamin v. Commissioner,66 T.C. 1084, 1097 (1976), affd. 592 F.2d 1259 (5th Cir. 1979). "To inspect the 'books of account' would require, at a minimum, that the respondent have access to and physically view a taxpayer's books and records." 66 T.C. at 1098; *315 Grossman v. Commissioner,74 T.C. 1147, 1156 (1980). We conclude that in 1979 respondent's agent did not inspect petitioner's books of account within the meaning of section 7605(b). Even if there had been inspection of petitioner's books of account in 1979, the record shows that the actions of respondent's agent in 1980 did not constitute a second inspection. Respondent's agent testified that in 1980 he relied primarily upon petitioner's 1977 return and the corporate books and records made available to him. The prohibition of section 7605(b) does not extend to reviewing the records of third parties whose returns or records may be relevant to the issue. DeMasters v. Arend,313 F.2d 79, 86 (9th Cir. 1963). Respondent's agent obtained approval from the District Director in 1980 to reopen petitioner's taxable year 1977 and notified petitioner of the proposed adjustments. On the facts, we conclude that the actions of respondent's agent in 1980 were likewise not an "inspection" of petitioner's books of account within the meaning of section 7605(b). Finally, *316 there is no indication in the record of any objection by petitioner to any alleged second inspection of his books of account. Neither in his petition, nor his briefs, does petitioner allege any facts to show any objection to respondent's reexamination of 1977 or that he was unaware that respondent was reexamining 1977. We infer from these omissions that petitioner was aware of respondent's reexamination of 1977 and consented to the inspection of whatever records, if any, may have been seen, by respondent's agent, be they returns and schedules, corporate books of account or additional materials. Rife v. Commissioner,41 T.C. 732, 747 (1964), affd. on this issue 356 F.2d 883 (5th Cir. 1966). In any event petitioner had knowledge of the actions of respondent's agent in 1980 and by making no objection thereto consented to any second inspection of his 1977 books of account.
II. Constructive Dividends Income - 1977, 1978 and 1979.
Whether advances are loans or constructive dividends is a question to be decided based on the facts and circumstances present *317 in the case. Busch v. Commissioner,728 F.2d 945 (7th Cir. 1984), affirming T.C. Memo. 1983-98; Pierce v. Commissioner,61 T.C. 424, 430 (1974); Chism's Estate v. Commissioner,322 F.2d 956 (9th Cir. 1963), affirming T.C. Memo. 1962-6; Roschuni v. Commissioner,29 T.C. 1193 (1958), affd. 271 F.2d 267 (5th Cir. 1959). The standard to be applied is whether both the borrower and the lender intended at the time the advances were made that these advances be repaid. Estate of Taschler v. United States,440 F.2d 72, 75 (3d Cir. 1971); Commissioner v. Makransky,321 F.2d 598 (3d Cir. 1963), affirming 36 T.C. 446 (1961); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970). That subjective intent of the parties to the transactions is determined from their objective manifestations. Spheeris v. Commissioner,284 F.2d 928 (7th Cir. 1960), affirming a Memorandum Opinion of this Court. Petitioner contends that the evidence clearly establishes his intention *318 and that of the Company to treat the advances as loans and to require repayment. In addition, he argues that he had a reasonable basis for expecting that the loans could and would be repaid. Respondent argues that the borrower's complete control of the lender is an indicium of dividends. We have held that transactions between closely held corporations and their shareholders require close scrutiny. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). However, to hold that shareholder control in and of itself repudiates the bona fides of a loan would be to say that a corporation may never make bona fide loans to its shareholders. We agree with respondent that "loans" where the debtor and creditor are, in effect, one and the same creates obvious difficulties. That is, of course, a reason for applying the close scrutiny called for in such a situation. Even applying this standard, we have long held that *319 a corporation may make valid loans to a sole shareholder. Faitoute v. Commissioner,38 B.T.A. 32, 35 (1938). We have given great weight to a taxpayer's credible testimony regarding his repayment intention. Where that testimony was unrebutted by respondent and corroborated by additional witnesses its effect has been enhanced. Pierce v. Commissioner, supra.Throughout his testimony petitioner stated that he always intended to repay the advances made to him. This was his stated intention at the time the loans were made, during the years in issue -- and prior to any questioning of their characterization by respondent, and continued to be his stated intention through the time of trial. This testimony was corroborated by Ms. Bohn who testified that Mr. Byorick insisted upon filling our promissory notes for the amounts borrowed, that petitioner always knew when interest was due and made arrangements for its payment or for execution of a note representing its payment, that at every opportunity petitioner made payments on his obligations to the company, and that *320 on many occasions Mr. Byorick stated his intention to repay these advances with the proceeds of the ventures in which he invested the advances. Petitioner's insistence upon loan documentation is relevant to the intention to repay. Pierce v. Commissioner, supra at 431. As noted, petitioner regularly executed a promissory note when he received an advance from his company. The record discloses interest-bearing notes for the vast majority of the advances made to petitioner. The amounts of these obligations were recorded upon the company's books and records, ledgers, financial statements of the company and petitioner, and on the corporate tax returns. A corporation's consistent treatment of funds advanced as loans on its financial records is inconsistent with dividend treatment. Wiese v. Commissioner,35 B.T.A. 701, 705 (1937), affd. 93 F.2d 921 (8th Cir. 1938). Repayments of principal and interest are further indications of petitioner's intention *321 to repay. Pierce v. Commissioner, supra; Haber v. Commissioner, supra. This is especially true where substantial repayments of principal and interest occured prior to any questioning by respondent of the bona fides of the loans. Miele v. Commissioner,56 T.C. 556, 568 (1971), affd. 474 F.2d 1338 (3d Cir. 1973). The record reveals payments by petitioner, subsequent to the February 1977 repayment of $ 715,000, in excess of $ 410,000, consisting of some $ 91,000 in interest and over $ 320,000 in principal. At most, only $ 20,000 of these payments can be attributed to further advances from the Company. Thus petitioner was not "paying the Company with its own money" as respondent contends. We find that the amount of these payments, over $ 410,000, when compared with the post-February 1977 withdrawals of $ 364,380, to be highly indicative of petitioner's intent to repay. Furthermore, the fact that petitioner was unable to repay the entire amount is not an issue. Unforeseen financial setbacks subsequent to the withdrawals do not affect petitioner's intention at the time the funds were advanced. [10]
*322 Respondent contends petitioner had no fixed repayment schedule for his debt which respondent states indicates merely a conditional intent on his part to repay. We find, however, that the record clearly indicates that it was petitioner's business practice to obtain unsecured ninety-day loans from banks which were simply rolled over at the end of the term with the interest-paid or added to his principal balance. We do not, under these circumstances, consider the absence of a fixed maturity date for the advances to be significant. An additional indication of intent to repay is a taxpayer's reasonable belief that he would in fact be able to do so. This belief is best determined by looking to whether there was "a reasonable expectation of repayment in light of the economic realities of the situation." Fisher v. Commissioner,54 T.C. 905, 910 (1970). At the time of the advances between 1977 and 1979 petitioner reasonably believed his investment in the Catalpa property to be worth between approximately $ 1,500,000 and over $ 2,000,000. At the time of the advances in 1980 *323 and 1981 petitioner reasonably believed his profit interest in Dano under D.C. contracts was worth in excess of $ 3,000,000. In spite of what may appear in retrospect to have been the exercise of poor business judgment in a number of his investments, we are satisfied that it was reasonable for petitioner to believe that he would be able to repay all the advances he received from the Company. After considering the record herein, we conclude that both petitioner and the Company did intend for the advances made to petitioner to be repaid. Petitioner presented credible testimony of this intent which was unrebutted by respondent and corroborated by Ms. Bohn who worked with petitioner when the advances were made. Their testimony was supported by extensive documentary evidence which treated the advances as loan obligations of petitioner to the Company. In particular, the majority of the advances were evidenced by promissory notes requiring the payment of interest. Significant amounts of principal and interest were paid by petitioner prior to the initial audit of these years and throughout the years in issue. Petitioner testified that he intends to repay the remaining obligations if, *324 and when, he becomes able to do so, which is possible depending on the outcome of the Dano appeal. Finally, petitioner's financial holdings during the years in issue were sufficient to justify his belief that he could repay. We hold the amounts advanced in 1977, 1978 and 1979 were bona bide loans and not taxable constructive dividends.
III. Constructive Dividend Income - 1980 and 1981.
Respondent contends petitioner received advances from the Company in calendar 1980 totalling $ 100,401.94 and in calendar 1981 totalling $ 39,941.91. As with the earlier years, respondent argues these advances should be characterized as taxable dividend income to petitioner. As noted previously, respondent amended his answer to assert constructive dividend income in these years and thus bears the burden of proof on this issue. Rule 142(a). The only evidence presented at trial regarding these advances was the testimony of respondent's revenue agent who read from the Company's loan receivables ledger. This agent acknowledged at trial that the majority of these funds represented accounting adjustments, and that we was unaware of the basis for making the adjustments. From the facts presented *325 herein, we hold that respondent has failed to satisfy his burden of proof that such amounts were in fact advanced to petitioner by the Company in 1980 and 1981. We, therefore, decline to characterize any such funds as constructive dividends.
IV. Accrual of Interest Income by M. J. Byorick, Inc.
It appears from petitioner's brief that the Company does not contest this issue if we determine that the advances to petitioner were loans. However, we are uncertain as to whether the Company has actually conceded the issue. Under section 451(a) "The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." The general rule for inclusion for an accrual basis taxpayer is the so-called "all-events" test set forth in section 1.451-1(a), Income Tax Regs. *326 [11]
This general rule thus indicates that the Company should have accrued the interest due and owing on petitioner's debt to the Company. The general rule is, however, subject to exceptions. Where the receipt is sufficiently doubtful, justice dictates an exception to the accrual requirements. Corn Exchange Bank v. United States,37 F.2d 34 (2d Cir. 1930). The standard allowing non-inclusion is whether -- in all probability the income will not *327 be received. The government should not tax under the claim of income, that which is not received during the taxable year and in all probability will not be paid within a reasonable time thereafter. When and if such income is received, it must be returned as such for the year received. [Corn Exchange Bank v. United States, supra at 35.]
Like most exceptions to general rules, this non-inclusion exception is to be narrowly construed, for to do otherwise would undermine the integrity of the accrual accounting system.[12] We have previously limited application of this exception to those situations were there is no "reasonable expectancy" of receiving the income. Chicago & North Western Railway Co. v. Commissioner,29 T.C. 989 (1958). The determination of such a "reasonable expectancy" is a question of fact. 29 T.C. at 996.
We have set forth petitioner's financial statement for the years here in issue. From *328 this statement it appears that petitioner was able to pay interest upon his advances so that the company would have a "reasonable expectancy" of payment during the years here in issue. On the basis of this record we conclude that the Company was not entitled to the non-inclusion exception since there was a reasonable expectancy of payment during the years in issue. We sustain respondent's determination requiring the inclusion in income by the Company of the accrued interest income for its fiscal years ending January 31, 1981 and 1982.
V. M. J. Byorick, Inc.'s Advances to Other Entities.
Not only does respondent seek to recharacterize the advances made from the Company to petitioner, he also seeks to characterize advances the Company made to other entities as constructive dividends to petitioner. According to respondent these advances were made for petitioner's personal benefit and therefore should be classified as taxable dividend income to him. Respondent relies upon Johnson v. Commissioner,620 F.2d 153 (7th Cir. 1980), affirming a Memorandum Opinion of this Court, to support his position. We conclude that the Johnson case, disallowing the taxpayer's *329 individual retirement account deductions because he was an active participant in a qualified retirement plan, has no bearing on the outcome of this issue. We agree with respondent that a shareholder need not receive funds directly to be the recipient of a constructive dividend. Dean v. Commissioner,57 T.C. 32, 40 (1971); Idol v. Commissioner,38 T.C. 444 (1962), affd. 319 F.2d 647 (8th Cir. 1963). We also agree with respondent's statement that Sammons v. Commissioner,472 F.2d 449 (5th Cir. 1972), affirming in part, revg. in part and remanding a Memorandum Opinion of this Court, holds that a taxpayer need not own all the stock of the corporate recipient of the funds from another corporation owned by that taxpayer in order to be considered as having received a constructive dividend. However, as the Court in Sammons v. Commissioner, supra at 451, further pointed out: *330 That principle [that a transfer from one corporation to another may constitute a dividend to an individual who has an ownership interest in both], however, does not provide a base for reasoning inductively to the broader proposition that all transfers from one corporation to another constitute dividends to a stockholder of both. Certainly, an advance to a corporation may be attributed to a particular shareholder when it is used for his personal benefit. However, "the test is whether the advances from [one corporation to the other] were primarily to benefit [the common shareholder]. Rushing v. Commissioner,52 T.C. 888, 893 (1969), aff'd. 441 F.2d 593 (5th Cir. 1971). In Rushing v. Commissioner, supra, this Court found that the taxpayer received no personal benefit and, therefore, rejected respondent's constructive dividend characterization for funds advanced from one corporation to another, stating: we must recognize that Briercroft was a taxable entity separate from [the taxpayer]. [Citations omitted] We have decided that whatever personal benefit, if any, [the *331 taxpayer] received was derivative in nature. Since no direct benefit was received, we cannot properly hold he received a constructive dividend. [Rushing v. Commissioner, supra at 894.] Similarly, in Rapid Electric Co. v. Commissioner,61 T.C. 232 (1973), this Court rejected respondent's attempt to recharacterize a credit advance between two commonly controlled corporations as a constructive dividend to the common shareholder. We found that the credit extension was necessary for both corporations to survive and rejected respondent's contention that the yearly increase in the accounts receivable balance, which was subsequently not collected, was a constructive dividend to the corporation's common shareholder. In Rapid Electric v. Commissioner, supra, we reiterated the principles in Rushing v. Commissioner, supra, and Sammons v. Commissioner, supra, that transfers between corporations may be characterized as constructive dividends where they are made principally for the shareholder's personal benefit but noted: *332 "The mere fact, however, that an individual as sole shareholder might derive some indirect or incidental benefit from the transfer is not sufficient to give rise to a constructive dividend." Rapid Electric v. Commissioner, supra at 239. The record does not support respondent's argument that the advances were a benefit to petitioner even though some of them appeared on the company's books as loans receivable from petitioner after accounting adjustments. Petitioner was a fifty-percent or less shareholder in the recipient entities -- one of which was not a corporation but a joint venture. We will not disregard the corporate entities of the corporation. Rushing v. Commissioner, supra.Also, the debts were carried on the Company's books as debts of the various entities. Rapid Electric v. Commissioner, supra.
The Company had additional business reasons for making the advances to Dano. It was to have been the steel contractor in the King George County facility. Such a business purpose provided additional assurance that the advances were not merely for petitioner's personal benefit. Rushing v. Commissioner, supra; *333 Rapid Electric v. Commissioner, supra.
Considering the record, as a whole, we conclude that any benefit petitioner received from the Company's loans to other entities was merely derivative and incidental rather than direct and primary and thus these advances did not constitute constructive dividends to petitioner. Rapid Electric v. Commissioner, supra.
Decisions will be entered under Rule 155.
Footnotes
*. Respondent in the notice of deficiency made adjustments to the corporate income for the fiscal years ending January 31, 1981, which resulted in a decrease in the net operating loss carryback to the year ending January 31, 1978. For this reason the adjustments for the fiscal year 1981 are in issue.↩
1. The statutory notice in Michael J. Byorick and Mary M. Gregg v. Commissioner, docket No. 33357-85, was addressed to Michael J. Byorick and Mary M. Byorick. For the years 1977 and through 1981 petitioner Mary M. Gregg was married to Michael J. Byorick. These parties were divorced on December 13, 1983. The parties have stipulated that Mary M. Gregg is an innocent spouse who, pursuant to sec. 6013(e) and sec. 1.6013-5, Income Tax Regs.↩, is relieved of responsibility for the deficiencies as issue in these cases and from any liability for tax, additions to tax, interest, or other amounts determined to be owing in these cases.
2. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. The loan balance equals $ 677,000, but the parties do not discuss the $ 1,000 discrepancy from the stipulated balance. ↩
*. Unsecured amount payable. ↩
4. This amount was recorded on the Company's books and records in a January 31, 1979, adjustment to petitioner's loan account. ↩
5. Advanced to H&M Builders, readvanced to petitioner; recorded on books ass a loan to H&M Builders. ↩
*. To repay loans to petitioner from the Bank of Virginia the proceeds of which had been used for Catalpa Hills Development and other business ventures. ↩
**. No explanation is in the record as to the "other uses."↩
*. $ 133,039.25 of which represents a September 30, 1978, accounting adjustment. ↩
*. No explanation is in the record as to the "other uses."↩
6. Petitioner asserts he made payments to the Company during 1977 in the amount of $ 34,000 which he cannot substantiate because his cancelled checks were not returned following an audit of his 1977 taxable year when his interest deductions were in issue. ↩
7. The parties stipulated that the date was correct. ↩
8. The parties stipulated that the date was correct. ↩
9. Section 7605(b) provides as follows: Restrictions on Examination of Taxpayer. -- No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary. ↩
10. See Turner v. Commissioner,T.C. Memo. 1985-159, affd. 812 F.2d 650↩ (11th Cir. 1987), where the Court accepted the taxpayer's statement that he believed he had the financial ability to repay at the time of the advances even though he subsequently experienced extreme financial reverses. 11. Section 1.451-1(a), Income Tax Regs., reads in pertinent part as follows: (a) General rule. Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer unless includible for a different year in accordance with the taxpayer's method of accounting. Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy.↩ * * * [Emphasis added.] 12. See Johnson v. Commissioner,T.C. Memo 1982-517, affd. 729 F.2d 1447↩ (3d Cir. 1984).